STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

04-1342

M. JAYNE YELLOTT

VERSUS

UNDERWRITERS INSURANCE COMPANY AND SABINE POOLS, INC.

**********
APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2001-672
HONORABLE CHARLEY QUIENALTY AND
HONORABLE DAVID RITCHIE, DISTRICT JUDGES

**********
ULYSSES GENE THIBODEAUX
CHIEF JUDGE
**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Jimmie C. Peters, Marc T. Amy, Michael G. Sullivan, and Elizabeth A. Pickett, Judges.

AMY, J., CONCURS IN PART AND DISSENTS IN PART AND ASSIGNS REASONS.

AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.

Rudie R. Soileau, Jr.
717 Pujo Street
Lake Charles, LA 70601
Telephone: (337) 433-0110
COUNSEL FOR:
        Plaintiff/Appellant - M. Jayne Yellott

Patrick J. Briney
Richard R. Montgomery
Briney & Foret
Post Office Box 51367
Lafayette, LA 70505-1367
Telephone: (337) 237-4070
COUNSEL FOR:
        Defendants/Appellees - Sabine Pools, Inc. and Underwriters
        Insurance Company

**V. Ed McGuire, III**
**Plauche', Smith & Nieset**
**Post Office Drawer 1705**
**Lake Charles, LA  70602**
**Telephone:  (337) 436-0522**
**COUNSEL FOR:**

**Intervenor/Appellee - State Farm Mutual Automobile Insurance Company**

THIBODEAUX, Chief Judge.

This personal injury action, arising out of a car collision between a left-turning pickup truck and the plaintiff's vehicle, which was attempting to pass, was tried by jury and resulted in a fault allocation of 50% to each driver. The jury awarded the plaintiff, M. Jayne Yellott ("Yellott"), $10,000.00 for loss of past earnings and $90,000.00 for past, present, and future medical expenses. However, the jury rejected Yellott's request for general damages and damages for loss of future earning capacity. Yellott has appealed, contending that a reallocation of fault is necessary based on the evidence presented at trial and that the damage award should be requantified and further modified to reflect general damages and damages for loss of future earning capacity.

The defendants, Sabine Pools, Inc. and its insurer, Underwriters Insurance Company (hereafter collectively referred to as "Sabine Pools"), answered the appeal, seeking an increase in the allocation of fault to Yellott and additionally seeking a reduction in all monetary damages awarded to her. Sabine Pools has also asked this court to modify the assessment of court costs imposed by the trial court.

Both parties have asked this court to consider whether a new trial is due as a result of the trial court's denial of the parties' respective motions to preclude lay opinion testimony of fact witnesses for both sides, which the parties contend constituted inadmissible and prejudicial testimony. We conclude that the trial court committed legal error in allowing the lay opinion testimony of Trooper Ronald Mann and witnesses David Bunch and Michael LeLeux. We decline to remand for a new trial. Rather, because these legal errors interdicted the fact-finding process and were prejudicial, we conduct a *de novo* review of the record.

1

For the following reasons, we reverse the portion of the judgment which rejected the plaintiff's claims for general damages and damages for loss of future earning capacity. We award $100,000.00 in general damages and $181,694.00 for loss of future earning capacity. Further, we increase the award of damages to the plaintiff for past loss of earnings to $23,189.00 but decrease the award of medical expenses to the plaintiff to $34,500.00. Finally, we reallocate the assessment of fault to ninety percent to Sabine Pools, Inc. and ten percent to Ms. Yellott and trial court costs similarly of ninety percent to Sabine Pools, Inc. and ten percent to Ms. Yellott. The judgment is affirmed in all other respects.

I.

**ISSUES**

This appeal presents multiple issues. First, both sides of this dispute have asked this court to determine whether the trial court's admission of certain lay opinion testimony from multiple fact witnesses constituted error that necessitates a new trial. Additionally, this court is faced with the question of whether the jury's allocation of fault and its damage awards are reasonable based on the evidence presented at trial. Finally, this court has been asked to consider whether the trial court's assessment of court costs to the parties should be modified.

II.

**FACTS**

On August 21, 2000, a car accident occurred between Yellott, who was driving a Pontiac Grand Am, and David Bunch ("Bunch"), the employee/driver of a Sabine Pools GMC 3500 extended cab, heavy duty pickup truck. The events leading

2

up to and during the accident are disputed, as well as the extent of Yellott's resulting injuries.

Shortly before the accident occurred, Bunch turned west onto Louisiana Highway 379 from an intersecting roadway, Independence Road, at a distance of approximately one mile ahead of Yellott's approaching vehicle. Highway 379 is a paved, two-lane roadway where passing is permitted. The speed limit is 55 miles per hour. Bunch testified that after seeing the approaching vehicle, he turned left onto the highway and turned on his left turn signal. He claims that he never exceeded 25 miles per hour once he turned onto the highway since he intended to make a left turn into the driveway of a co-worker's home, located about 100 yards west of the intersection.

Yellott, who was traveling westward in the right lane of Highway 379 in her Pontiac Grand Am, approaching Independence Road, was being followed by her friend, Rebecca Hoffpauir ("Hoffpauir"), who was driving a Ford Mustang. They both testified to seeing the Sabine Pools truck turn left onto Highway 379 off of Independence Road as they approached and confirmed that the driver was proceeding at a slow rate of speed, well below the speed limit, once on the highway. Both denied seeing a turn signal or any other indication from the driver that he was intending to make a turn.

Yellott testified that after driving behind the truck for a short distance, she decided to pass it. Hoffpauir testified that she continued to drive in the right lane of the highway behind the Sabine Pools truck while Yellott began to pass. Yellott contends that after determining there was no oncoming traffic, she drove across the centerline into the left lane of the highway and increased her speed to attempt to pass the Sabine Pools truck. While in the process of overtaking the truck, she asserts that

3

its driver, without warning or signaling in any manner, began a left turn, crossing over the centerline, directly into her lane of travel. Because of her position virtually parallel to the truck, she applied her brakes, but claims to have been unable to avoid the collision.

The record reflects that the collision with Yellott's vehicle bent the truck's large side mirror backwards towards the truck, and caused damage to the truck's front driver's side wheel assembly and tire. No other physical damage to the truck is evident from the record. Likewise, the only apparent physical damage to Yellott's car that was established in the record was damage to its front passenger side quarter panel. The impact knocked her car to the left and off of the roadway, where it vaulted a roadside ditch and came to rest in a neighboring lot. Yellott's airbags deployed as a result of the accident. Bunch stopped the Sabine Pools truck in the driveway that he was attempting to enter. Yellott argues in this appeal that the nature of the physical damage to both vehicles is evidence of their vehicles' respective locations at the time of the crash and is, consequently, evidence of Bunch's sole fault in causing it.

Sabine Pools' theory of how the accident occurred is based primarily on the testimony offered by Bunch and a co-worker, Michael LeLeux ("LeLeux"), who was riding as a passenger in the Sabine Pools truck at the time of the accident. Bunch claims that Yellott was solely responsible for the accident because she crashed into the truck as he was in the process of a lawful, left turn. According to his version of events given at trial, he was able to see Yellott's vehicle approaching the truck at a distance of about one-half of a mile away, as he made his left turn. LeLeux, notably, testified that he did not see any vehicles on the highway behind the truck prior to the accident occurring. Bunch went on to testify that he saw Yellott speeding at

4

approximately 90 miles per hour when he checked his mirrors. He opined that this, in addition to her inattention to his turn signal, resulted in her crashing into the truck as he made his turn.

Moreover, Bunch and LeLeux identified and measured skid marks on the day *after* the accident, which began in the right lane of the highway and extended into the left lane, concluding that they were those left by Yellott's vehicle. Relying on these witnesses' identification of this set of skid marks as those having been made by Yellott's vehicle, although other skid marks were also noted at the scene, Sabine Pools argues that this establishes that Yellott initiated an unsafe passing maneuver after Bunch had already turned left and was driving into the driveway. This negligence, they contend, places Yellott solely at fault in causing the collision.

The investigating state trooper at the scene, Ronald Mann ("Trooper Mann"), reached different conclusions. He testified that during his investigation at the scene, he observed multiple sets of skid marks and was able to ultimately determine that those skids made by Yellott's vehicle were located wholly in the left lane of the highway. He determined that there was no yaw or other evasive action apparently made by Yellott's vehicle immediately prior to the accident. In addition, he concluded that Yellott had not been traveling at a rate of 90 miles per hour at the time of the impact, but opined, based upon calculations made from measurements of skid marks taken at the scene *on the day* of the accident, that she had been traveling at a rate of about 70 miles per hour while overtaking the Sabine Pools truck. As a result of his findings, he testified that Yellott's car was already completely in the left lane of the highway when Bunch initiated his left turn, contrary to Bunch's assertions, and that Bunch crossed the centerline into the left lane of the highway, striking Yellott's vehicle, apparently unaware of her location.

5

The parties offer differing opinions regarding the extent of any physical and mental injuries suffered by Yellott as a result of the accident as well. In her lawsuit, Yellott claimed damages for a nonexclusive list of bodily injuries, as well as for mental injury. Sabine Pools attempted to minimize the credibility of any evidence or argument presented, regarding injuries sustained by Yellott, based in large part on the fact that Yellott denied being hurt at the scene and declined the need for any onsite medical treatment or transportation to a medical facility. However, Yellott contends that the onset of her pain began later that day and has continued virtually uninterrupted since that time. She also testified to doing an uncharacteristic and excessive amount of sleeping during the immediate days following the accident. Hoffpauir corroborated Yellott's testimony regarding the onset of her pain complaints and her sleeping behavior in the days following the accident.

Yellott received treatment over the next few years with various physicians for her alleged injuries. Evidence presented at trial reveals that after the accident, she underwent chiropractic spinal manipulations and steroid injections and was prescribed oral anti-inflammatory and arthritic medication and physical therapy to address various diagnoses of whiplash syndrome, a knee contusion, cervical and lumbar sprains, and pinched nerves in her right shoulder's rotator cuff. As of the time of trial, Yellott's complaints consisted of memory loss problems (the onset of which she dates back to the accident's occurrence) and back and neck pain, in addition to shoulder pain, which was contributing to right arm numbness and weakness. Surgery has been recommended to Yellott to alleviate the arm and shoulder symptoms.

In describing her alleged mental injuries, Yellott testified that she suffered cognitive losses, which have most notably affected her memory and have led to a decline in her mood from a generally positive and independent nature to a more

6

negative and dependent one. These changes, she contends, when coupled with her other physical ailments, caused a change in her lifestyle from a highly active one to an uncharacteristically sedentary existence. Yellott's daughter and two co-workers corroborated her testimony. Each of these witnesses testified that Yellott seemed more limited in her physical abilities, that her mood and/or attitude had negatively declined, and that she had a seemingly more difficult time recalling things.

Yellott asserts that the changes she experienced, when coupled with her physical ailments, resulted in her finding it necessary to voluntarily resign from her full-time position as a nurse in the medical telemetry unit of St. Patrick's Hospital, where she often worked as a charge (lead) nurse. Her personnel records at St. Patrick's Hospital failed to reflect any decline in her job performance, however. Yellott resigned from her position at St. Patrick's Hospital and obtained a full-time job as a nurse at a small, 13-bed rehabilitation facility. This job, she testified, required less physically and mentally demanding work, but offered less pay, did not provide overtime opportunities, and offered fewer benefits than those she had received from her last position. She lamented during trial that although this job change was, in her opinion, necessary, it had caused and would continue to cause her to lose vital nursing skills and to miss valuable learning and money-making opportunities.

The defense's expert, neuropsychologist Dr. William Black, found no evidence of a closed head injury, but concluded that Yellott suffered from a somatization disorder, which he described as the unconscious manifestation of emotional problems through physical symptoms. Essentially, he opined that rather than dealing with emotional stress or upsets, she suppresses them, resulting in an unconscious manifestation of seemingly physical ills. In her case, he opined that the

7

disorder was the likely result of an emotionally stressful past, which had included multiple divorces and the death of a child in a car accident, leading him to surmise that the trauma of the car accident at issue triggered the disorder. He diagnosed Yellott's pain complaints as "subjectively reported" chronic pain syndrome.

Yellott's expert, on the other hand, neuropsychologist Dr. Charles Robertson, disagreed with the somatization disorder diagnosis based upon the fact that Yellott's medical history did not reflect any indication of past behavior that is generally supportive of such a diagnosis, and the fact that her complaints of physical injury had been objectively verified by multiple physicians. Instead, Dr. Robertson diagnosed Yellott with a cognitive disorder, which he contends was caused by a mild, traumatic brain injury suffered in the car accident at issue. Yellott's history of prior head injuries was significant to Dr. Robertson's diagnosis. In sum, he opined that as a result of the car accident, she suffered a diminished capacity to multiprocess information, when compared with her previous superior ability to do so, and believed that her job switch was a proper method of adapting to the changes in her cognitive functioning abilities. Dr. Robertson also resolved that Yellott suffered from chronic pain syndrome, associated with trauma and psychological stress.

These opposing experts both recommended future psychological counseling and/or treatment for Yellott, but differed as to the *extent* and *manner* of treatment to be rendered.

III.

## LAW AND DISCUSSION

### *Objection to Lay Testimony*

Both sides to this case contend that the trial court committed error by allowing inadmissible and prejudicial lay opinion testimony from various witnesses

8

over their respective motions *in limine* and objections made during trial. Yellott contends that Bunch and LeLeux were able to voice opinions as to which skid marks located at the scene were made by Yellott's vehicle and, based on these unskilled observations, were further allowed to testify as to Yellott's allegedly negligent actions immediately prior to the accident. Likewise, Sabine Pools argues that the trial court improperly allowed the investigating state trooper, Trooper Mann, to testify that Bunch was issued a citation at the scene of the accident and also to improperly offer his opinion regarding Bunch's fault in causing the accident.

Testimony by a witness who is not testifying as an expert can be offered in the form of opinions and inferences, if such opinions and inferences are limited to those which are (1) "[r]ationally based on the perception of the witness;" and are (2) "[h]elpful to a clear understanding of his testimony or the determination of a fact in issue." La.Code Evid. art. 701.

### *Testimony by Sabine Pools Employees*

Yellott contends that no proper foundation was laid for the introduction of the opinion testimony offered by LeLeux and Bunch about the skid marks, numerous markings, or about how the accident occurred. She argues that the error, caused by allowing the jury to hear this testimony over counsel's objections, resulted in an erroneous allocation of fault to the parties. We agree with Yellott's argument that the trial court erred in allowing this testimony from Bunch and LeLeux.

While a lay witness may identify the *existence* of markings near an accident scene, that witness does not possess the requisite level of skill and expertise to assign skid markings to a particular vehicle nor can a lay witness reconstruct an accident based on their subjective assignment of skid marks to a vehicle. Such testimony goes beyond mere identification of markings and skid marks and crosses

9

the line into accident reconstruction. That is what occurred in this case. The opinions and inferences of Bunch and LeLeux were not rationally based on their perceptions. La.Code Evid. art. 701. Thus, it was legally impermissible to allow their testimony on this issue. We conclude that this error tainted the fact-finding process and prejudiced Ms. Yellott's case. See La.Code Evid. art. 103(A).

### *Testimony by Trooper Mann*

Sabine Pools argues that Trooper Mann "rendered highly prejudicial and inadmissible opinion testimony, testifying that he issued a citation to Mr. Bunch after he concluded where the vehicles were when the accident events began." In further argument, Sabine Pools contends that "[b]ecause the overwhelming evidence supported a finding of no fault on the part of Mr. Bunch, it is clear that the jury's decision on liability was influenced by Trooper Mann's inadmissible testimony."

The question prompting the response at issue was as follows: "Why were skid marks a focus of your investigation at the scene of this crash on Houston River Road on August 21, 2000?" Following this question, the trial court advised Trooper Mann, "Sir, in the presence of the jury, I want to instruct you that you are not permitted to give opinions." The trial court further advised the Trooper to "restrict [his] answer to non-opinion answers." Trooper Mann responded as follows:

> In order to issue the citation of 32:79, improper lane usage [the] investigating officer must determine where each vehicle was at the time of the crash. To do that, you need to determine if the vehicle in possession of each lane was in that lane or in possession properly.

> Mr. Bunch was westbound on 379, he was in possession of the westbound lane of LA 379, or Houston River Road. Ms. Yellott, to determine where Ms. Yellott was at for the citation issued, I had to determine exactly where she was at when Mr. Bunch began her [sic] turn and caused Ms. Yellott to apply her brakes and start the skid marks.

10

In response to an objection posed by the defense, the trial court gave a corrective instruction to the jury regarding the statement, wherein the court stated:

> Folks, everybody now and then during the trial something is said or done or exhibited that should not have been said, done or exhibited. Remember I told you we were going to decide this case on the evidence presented here and the testimony permitted and in the document [sic] evidence permitted. Okay? But every now and then, you know, we're humans, we're far from perfect. So, there was a mention made of quote "citation," quote. That mention is absolutely not relevant to this case and you are instructed to disregard the mention of that word and erase it from your memory. There have been no other proceedings in this case other than the one that is ongoing.

The court, thereafter, polled the jury, inquiring as to whether they would be able to put aside the mention of a citation, and each juror stated that he or she could do so.

While the trial court's curative instruction on the issuance of a citation may have cured this testimonial defect, it did not impact the error in the admission of his testimony regarding the *location* of the vehicles immediately preceding the impact.

We recognize that, in some instances, our appellate courts have affirmed the admission of opinion testimony by police officers who are not experts, based on their training, investigation, perception of the scene, and observation of physical evidence. *See Eldridge*, 888 So.2d 365 (citing *Cooper v. State Dep't of Transp. & Dev.*, 03-1847 (La.App. 1 Cir. 6/25/04), 885 So.2d 1211, *writ denied*, 04-1913 (La. 11/8/04), 885 So.2d 1142); *Bozeman v. State Dep't of Transp. & Dev.*, 34,430 (La.App. 2 Cir. 4/4/01), 787 So.2d 357, *writ denied*, 01-1341 (La. 6/29/01), 794 So.2d 813. Trooper Mann was not tendered as an expert in accident reconstruction at trial. He possessed experience in accident investigation, as most troopers do. However, this experience did not talismanically allow Trooper Mann to determine the

location of the parties' vehicles and the resulting *cause* of the accident. The admission of this testimony was legal error.

### *Allocation of Fault*

The propriety of the jury's allocation of fault has been questioned on appeal by both sides to this dispute. The applicable standard of review regarding the factual consideration of respective degrees of fault is the manifest error or clearly wrong standard. *Clement v. Frey,* 95-1119, 95-1163 (La. 1/16/96), 666 So.2d 607. This well-known standard prohibits an appellate court from altering a fact finder's determinations, unless those determinations and findings have been found to be clearly wrong upon review of the trial court record. While applying this standard, great deference must be given to the fact finder's results; however, the appellate court is required to simultaneously remain mindful of its constitutional duty to review the facts. La.Const. art. 5, §§ 5(C), 10(B); *Clement*, 666 So.2d 607; *Ambrose v. New Orleans Police Dept. Ambulance Serv.*, 93-3099, 93-3110, 93-3112 (La. 7/5/94), 639 So.2d 216. In doing so, should it be determined that the record supports a finding that the fact finder was clearly wrong or that it abused its wide discretion, this court is empowered to reallocate fault. *Clement*, 666 So.2d 607. The deference we continue to owe to the fact finder, however, restrains us in any such reallocation, in that we are allowed to adjust fault only to the extent of lowering or raising it to the highest or lowest point, respectively, which would have been reasonably within the jury's discretion. *Id*.

In considering the fault of the parties involved in this accident, we must examine the duty of care imposed upon each of them by law. The duties placed upon left-turning and passing motorists are provided for by statute. First, a left-turning motorist, such as Bunch, is required to make an initial determination that such a turn

12

can be safely made before doing so and must also give a continuous signal of the intention to make the turn during not less than the last 100 feet traveled before turning. La.R.S. 32:104. The statute prohibits a sudden stop or decrease in speed without first giving this signal to any following vehicles. *Id*. Regarding a passing motorist, such as Yellott, statutory law provides that when lawfully passing or overtaking vehicles that are traveling in the same direction, the driver is to pass to the left and at a safe distance away from the vehicle being passed. La.R.S. 32:73. Such passing is prohibited unless the left side of the highway is clearly visible and free of oncoming traffic for a sufficiently safe distance to allow the passing maneuver to be completed in a safe manner. *Id*. In an auto collision case, a presumption exists that the defendant's negligence caused the accident, when it is shown that the defendant made a left turn and crossed the centerline at the time of impact. *Kilpatrick v. Alliance Cas. & Reinsurance Co.*, 95-17 (La.App. 3 Cir. 7/5/95), 663 So.2d 62, *writ denied*, 95-2018 (La. 11/17/95), 664 So.2d 406.

Based upon our review of the record and consideration of the statutory duties of care imposed upon the respective drivers in this case, we find that the jury was clearly wrong in finding Yellott and the Sabine Pools' driver equally at fault in causing the accident. The objective evidence, we find, dilutes the power of the self-serving testimony of the Sabine Pools employees and dominates substantially in favor of the plaintiff. The photographs of the vehicles in the accident provide a clear picture of where the vehicles collided—at the passenger side front quarter panel of Yellott's vehicle and at the truck's driver side mirror and tire. The objective evidence clearly does not support Sabine Pools' scenario of how the accident occurred.

To begin with, Trooper Mann testified that he identified skid marks belonging to Yellott's vehicle located wholly within the left lane of the highway,

13

leaving him to rationally conclude that she was already in the left lane and in the process of passing, prior to the collision occurring. He was also able to determine from skid marks, that he found consistent with this scenario, that there was no yaw or other such evasive action made by Yellott's vehicle prior to impact.

A portion of the testimony offered by LeLeux offers support for Trooper Mann's conclusions regarding the location of the vehicles at the time of the accident. LeLeux testified to hearing a "boom" and then the sound of skid marks being made that appeared to be coming from behind him. One can reasonably infer that the noise he refers to is the impact of the two vehicles and the resulting sound of skid marks being made by Hoffpauir's vehicle, which was following. It is reasonable to infer from this testimony that if the "boom" referred to by LeLeux was the collision of the two vehicles, the Yellott vehicle would not be skidding after being involved in an impact with the Sabine Pools truck.

Additionally, Bunch's testimony regarding the speed of Yellott's vehicle before the collision is not reasonably supported by the evidence in the record. For one, Trooper Mann was able to estimate an approximate speed of Yellott and Hoffpauir's vehicles as 70 miles per hour. The speed was based on measurements taken from the skid marks that Trooper Mann believed had been made by Hoffpauir's vehicle. Sabine Pools offered no evidence to challenge the accuracy of these measurements and resulting calculations, other than Bunch's testimony of how fast the car appeared to be traveling, based on his personal observation of the approaching car. Moreover, Bunch testified that Yellott's car was about one-half of a mile behind him as he began to negotiate his left turn into the private driveway. Even if his testimony is to be taken as true, it would have taken 25.72 seconds for Yellott to travel one-half of a mile to reach the truck, at a speed of 90 miles per hour. If this

14

were the case, Bunch should have had time to see Yellott approaching and attempting to pass before he began his turn, or alternatively, this amount of time should have allowed ample time for him to complete this maneuver prior to the impact. It cannot be ignored also that the impact of a vehicle traveling at 90 miles per hour, as Bunch proposes, would have resulted in considerably more damage than that which was suffered by the vehicles in this accident.

Based on the evidence presented in the record, we find, therefore, that the jury clearly erred in its determinations and abused its discretion in its allocation of fault. We have considered the following factors in assessing the nature of the conduct of the parties and the extent of the causal relation between the conduct and the damages claimed: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the inferior or superior capacities of the actors, and (5) any extenuating circumstances which might require the actors to proceed in haste, without proper thought. *See Watson v. State Farm Fire & Cas. Ins. Co.,* 469 So.2d 967 (La.1985). As a result, we find that based on the facts presented, the left-turning motorist, Bunch, breached his high duty of care and should be assessed with 90% of the fault in causing this accident. We find Yellott 10% at fault in causing the accident.

**DAMAGES**

*Past, Present and Future Medical Expenses*

In examining the jury's award of past, present and future medical expenses in this case, the record reflects that the jury was informed of the expenses associated with Yellott's care up until the time of trial. These expenses reflected various doctor's visits, medication and fees relating to testing. The expenses totaled

15

$12,400.00.  Accordingly, this figure for past medical expenses is supported by the record and could have been appropriately included in the jury's award for medical expenses.

With regard to future care, the evidence supports a finding that Yellott may require future surgery for her shoulder complaints, as well as psychological counseling.  Specifically, orthopedist Dr. David Steiner, provided testimony regarding objective findings of fluid and changes in certain tendons in Yellott's shoulder, resulting in his recommendation that Yellott undergo a shoulder decompression surgery.  Based on Yellott's history, he related her condition to the accident at issue.  In his estimation, the surgery could cost as much as $2,500.00, with associated hospital expenses of $14,000.00.  Thus, an award of $16,500.00 for this surgery is supported by the record.  Although Dr. Steiner testified about the likelihood of the need for Yellott to undergo physical therapy after the surgery, no evidence was presented regarding the cost of such therapy, and, therefore, this expense is not supported by the record.

Regarding Yellott's alleged mental injury suffered as a result of the accident, Dr. Robertson offered testimony of estimated costs for his proposed treatments.  Dr. Robertson recommended one to two years of counseling to assist Yellott's recovery, explaining that weekly sessions would be necessary for the first six or seven appointments.  Thereafter, he recommended twice-monthly appointments.  Each session would cost $100.00.  Given his proposed two-year time frame, this testimony supports an award of $5,600.00.

No evidence was presented of estimated costs for Dr. Black's recommended course of treatment for Yellott.  Consequently, there is no basis for

16

which an award for his treatment could have been fashioned, and any such amount awarded by the jury is unsubstantiated and speculative.

Our review of the record ultimately reveals support for the jury's award of $12,400.00 for past medical expenses; $16,500.00 for the shoulder surgery recommended by Dr. Steiner; and $5,600.00 for the treatments recommended by Dr. Robertson. As these are the only medical expenses supported by the record, the jury's award of $90,000.00 in this regard is error. The past, present and future medical expenses award is reduced to that figure supported by the record, $34,500.00.

### *General Damages*

Next, we examine the propriety of the jury's failure to award general damages in light of the award of damages for past, present and future medical expenses. The supreme court in *Green v. K-Mart Corp.*, 03-2495 (La. 5/25/04), 874 So.2d 838, held that should a fact finder award special damages, but fail to award general damages, the appellate court must consider whether the award is so inconsistent that it indicates an abuse of discretion. If the court finds such an inconsistency, then a *de novo* review of the record is required. *Id*. As reflected above, the record supports an award of $34,500.00 for medical expenses. Although, we have found that the record supports a lower award for medical expenses than that which was originally awarded by the jury, we find that the jury correctly determined that Yellott suffered injuries causally related to the accident which required medical attention and is still suffering an injury that may require medical attention in the future. Failing to make a general damage award in such circumstances is an abuse of discretion. *See Green,* 874 So.2d 838. In conducting a *de novo* review of the record, it is determined that the extensive changes in Yellott's physical, psychological, and

17

emotional state, along with attendant changes in her life, mandate an award of $100,000.00 for pain and suffering and loss of enjoyment of life.

### *Lost Wages*

Regarding past lost wages, the evidence presented by Yellott resulted in a jury award of $10,000.00 for lost wages. Yellott seeks an increase to account for the pay and benefits differential between her position in the telemetry unit of St. Patrick's Hospital and her current position as a nurse at a rehabilitation facility. The manifest error standard applies to our review of this jury award and requires us to examine the facts or circumstances of the case in order to determine the adequacy or inadequacy of the award. *Thibeaux v. Trotter*, 04-482 (La.App. 3 Cir. 9/29/04), 883 So.2d 1128, *writ denied*, 04-2692 (La. 2/18/05), 896 So.2d 31.

In this case, Yellott presented expert testimony which quantified her past wage loss as $25,327.00, which was challenged by Sabine Pools' expert, who suggested actual lost wages incurred by Yellott as $23,189.00. The past wage loss claim, we recognize, is not one based on conjecture or speculation and, considering the evidence presented, find that the jury was clearly wrong in awarding past lost wages in the amount of $10,000.00. Accordingly, we increase Yellott's award for past lost wages to $23,189.00.

### *Loss of Future Earning Capacity*

Yellott contends further that the jury erred in failing to award damages for loss of future earning capacity. She presented testimony of her loss of ability to function in her role as a registered nurse in the telemetry unit at St. Patrick's Hospital after the accident, due to concerns over what she perceived to be memory and cognitive functioning losses, coupled with her physical ailments. Yellott presented

18

evidence regarding the specific wage losses suffered as a result of her change in positions, which included loss of benefits, contributions to a retirement account and loss of income. In light of the evidence presented at trial of physical and mental ailments suffered by Yellott as a result of the accident, we find that the jury's rejection of Yellott's claim for loss of future earning capacity is not supported by the record. *See Coco v. Winston Indus. Inc.*, 341 So.2d 332 (La.1977); *see also Veazey v. State Farm Mut. Auto. Ins.*, 587 So.2d 5 (La.App. 3 Cir. 1991).

The full indemnification for which an injured person, such as Yellott, is entitled to under this state's negligence principles includes damages for loss of future earning capacity. *See Coco,* 341 So.2d 332. This decreased earning capacity is determined by deducting the injured plaintiff's earning ability after injury from her earning ability immediately prior to the injury. *Id.* We find that the evidence presented supports an award of $181,694.00 for loss of future earning capacity.

### *Court Costs*

Based on the jury's allocation of fault equally between the parties, the trial court assessed the parties equally with costs of trial. This court, having found that the jury's allocation of fault was not reasonably supported by the record, has reallocated the fault in this case such that Sabine Pools is now assessed with 90% of the fault and Yellott with 10% of the fault. We accordingly reverse the trial court's equal assessment of court costs and cast the defendants and the plaintiff with their proportionate share of respective court costs of 90% and 10%.

IV.

## CONCLUSION

For the reasons assigned above, we find that the jury manifestly erred in assessing fault equally between the parties and it therefore, allocate 90% of the fault

19

to the defendants, Sabine Pools, Inc. and Underwriters Insurance Company, and 10% of the fault to the plaintiff, M. Jayne Yellott. We further reverse and amend the damages awarded by the jury to reflect general damages for past, present and future pain and suffering and loss of enjoyment of life in the amount of $100,000.00; damages for loss of future earning capacity in the amount of $181,694.00; damages for past lost wages in the amount of $23,189.00; and damages of $34,500.00 for past, present and future medical expenses. We further reassess 90% of the trial court costs to the defendants and 10% to the plaintiff. The trial court's judgment is affirmed in all other respects. Costs of this appeal are assessed to Sabine Pools, Inc. and Underwriters Insurance Company.

**AFFIRMED IN PART; REVERSED IN PART; AND RENDERED**.

NUMBER 04-1342

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

M. JAYNE YELLOTT

VERSUS

UNDERWRITERS INSURANCE COMPANY AND SABINE POOLS, INC.

AMY, J., concurring in part, dissenting in part.

I respectfully dissent from that portion of the majority opinion finding that a *de novo* review of the record is required and in the subsequent reapportioning of fault. In my opinion, the record supports the jury's assessment of fifty percent of fault to each of the drivers. Further, I would affirm the jury's award for past loss of earnings and its denial of damages for future loss of earning capacity as again I find that the record offers support for these determinations.

I agree with the majority that a reduction in the damages for past, present and future medical expenses is warranted. I also agree that general damages must be awarded, however I would award a lesser amount than does the majority.

For these reasons, I concur in part, dissent in part.