# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 05-1018

PATSY ANN COLLINS DOMINGUE, ET AL.

VERSUS

EXCALIBAR MINERALS OF LOUISIANA, LLC, ET AL.

**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 95415
HONORABLE KEITH R. J. COMEAUX, DISTRICT JUDGE

**********

## OSWALD A. DECUIR
## JUDGE

**********

Court composed of John D. Saunders, Oswald A. Decuir, Jimmie C. Peters, Elizabeth A. Pickett, and Billy H. Ezell, Judges.

Pickett, J., dissents and assigns written reasons.

Ezell, J., dissents for the reasons assigned by Judge Pickett.

**AFFIRMED.**

J. Louis Gibbens
Dennis Stevens
Gibbens & Stevens
222 W. St. Peter Street
New Iberia, LA 70560
Counsel for Plaintiffs/Appellees:
    Patsy Ann Collins Domingue, et al.

Cole A. Wist
Willa Perlmutter
Marci Fulton
Patton, Boggs, LLP
1660 Lincoln St., Suite 1900
Denver, CO 80264
Counsel for Plaintiffs/Appellees:
    Patsy Ann Collins Domingue, et al.

**Ralph E. Kraft**
**F. Douglas Gatz, Jr.**
**Jessica A. Devitt**
**Preis, Kraft & Roy**
**P. O. Drawer 94-C**
**Lafayette, LA 70509**
**Counsel for Defendant/Appellant:**
**Cameco Industries, Inc.**

**Kirk Lindsay Landry**
**Keogh, Cox & Wilson**
**P. O. Box 1151**
**Baton Rouge, LA 70821**
**Counsel for Intervenor/Appellee:**
**Valley Forge Insurance Company**

**DECUIR, Judge.**

In the workplace accident giving rise to this lawsuit, the plaintiffs' decedent was run over by a dump truck operated by his co-employee. The manufacturer of the dump truck, Cameco Industries, Inc., appeals the judgment of the trial court granting the plaintiffs' motion for judgment notwithstanding the verdict and finding Cameco 30% at fault in causing the accident. For the reasons which follow, we affirm the JNOV and deny both the plaintiffs' and the intervenor's answer to appeal.

## FACTS

The decedent, Russell Domingue, was killed in an industrial accident on the afternoon of June 14, 2000. Mr. Domingue and two other employees of M. Matt Durand, Inc. (MMD), Charles Judice and Brent Gonsoulin, were stockpiling barite ore at a mine site operated by Excalibar Minerals of Louisiana, L.L.C. and located at the Port of Iberia. MMD was a contractor hired by Excalibar to offload the ore. Judice and Gonsoulin were operating Cameco 405-B articulated dump trucks (ADTs) to offload the ore from a barge and transport it to a pile being built up by Mr. Domingue with a bulldozer. The two ADTs would make several trips, passing each other on the way to and from the barge and the stockpile where they would drop their loads. Mr. Domingue would then push the barite onto the growing pile of ore.

Sometime after 2:00 p.m., Gonsoulin, who was new to the job, had trouble dumping a large load of barite. Mr. Domingue, who was an experienced ADT operator, got off the bulldozer and walked over to Gonsoulin's ADT to give his co-worker some advice on how to dump the heavy load. If a load was too heavy, the bed of the dump truck would not go up without some assistance. Mr. Domingue instructed Gonsoulin to back toward the pile, hit the brakes, and pull the lever. Gonsoulin explained in his testimony, "The velocity of it's going to make the dump

pull up." This maneuver should be done repeatedly until the bed goes up and the load can be dumped.

While this conversation between Mr. Domingue and Gonsoulin took place, Judice continued on to the stockpile to dump another load. As he finished dumping his load, he turned his truck away from the pile and started to pull forward. Judice testified that he then saw "a pair of sunglasses and cigarettes fly." Judice immediately stopped his truck and discovered Mr. Domingue's body which he had run over.

## TRIAL COURT PROCEEDINGS

Plaintiffs are the widow and major children of the decedent: Patsy Ann Collins Domingue, individually, and as the administratrix of the estate of Russell Domingue and the natural tutrix of the minors, Adam, Elaine, and Rusty Domingue; Crystal L. Domingue; Chantelle Domingue Theriot; Angela S. Domingue; and Theresa Marie Domingue. The widow and her seven children brought suit against Cameco, alleging defects in the manufacture of the ADT which caused Mr. Domingue's death. Also named as defendant was Excalibar Minerals, which settled with the plaintiffs prior to trial and is no longer a party to this litigation. Valley Forge Insurance Company, the workers' compensation carrier for Mr. Domingue's employer, intervened seeking reimbursement for benefits paid on behalf of MMD. The case was tried to a twelve-person jury over five days. The verdict form submitted to the jury instructed the jury to assess fault among the following: Mr. Domingue; his co-worker, Judice; his employer, MMD; the lessor of the ADT, Barras & Durand, Inc.; the manufacturer of the ADT, Cameco; and the mine operator, Excalibar.

2

The jury found MMD 60% at fault in causing the death of Mr. Domingue. The jury also found the decedent was 35% at fault and Judice was 5% at fault. Barras & Durand, Cameco, and Excalibar were absolved of any liability. Damages were set at $1,101,050.00. The plaintiffs moved for judgment notwithstanding the verdict, which was granted by the trial court, reallocating fault as follows: Judice, 35%; Mr. Domingue, 35%; Cameco, 30%; and no fault on the part of MMD, Barras & Durand, and Excalibar. The judgment also gave Valley Forge a credit against the plaintiffs' award.

Cameco appeals the judgment of the trial court, seeking reinstatement of the jury verdict. The plaintiffs answered the appeal, arguing the 35% fault allocated to Judice should have been allocated to Cameco and the 35% fault allocated to the decedent should be reduced. Valley Forge also answered the appeal seeking to have this court "precisely state the dollar amount rendered in [its] favor," and award "additional recovery against the Defendants for any workers' compensation payments made between the date of the trial and the rendition of Judgment."

**ANALYSIS**

The law applicable to this case was recently reviewed by this court in *Williams v. W.O. Moss Regional Medical Center,* 05-022, pp. 2-3 (La.App. 3 Cir. 6/1/05), 903 So.2d 1150, 1152:

> Louisiana Code of Civil Procedure Article 1811(F) is the authority for a JNOV. The article provides that a motion for JNOV may be granted on the issue of liability or on the issue of damages or on both. In *Smith v. Lee*, 00-1079, pp. 2-3 (La.App. 5 Cir. 4/11/01), 783 So.2d 642, 644, *writ denied*, 01-1731 (La. 9/28/01), 798 So.2d 116, the court noted:
>
> > A judgment notwithstanding the verdict is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary

verdict. The motion should be granted when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. In making this determination, the court should not evaluate the credibility of the witnesses, and all reasonable inferences of factual questions should be resolved in favor of the non-moving party. See *Anderson v. New Orleans Public Services[Service], Inc.*, 583 So.2d 829 (La.1991), LSA-C.C.P. art. 1811 and *Davis v. Wal-Mart Stores, Inc.*, 00-445[,] 774 So.2d 84 (La. 11/28/00).

The standard of review for a JNOV on appeal is a two part inquiry: first, the appellate court must determine if the trial court erred in granting the JNOV, which is done by using the same criteria used by the trial judge in deciding whether to grant the motion. Second, after determining that the trial court correctly applied its standard of review as to the jury verdict, the appellate court reviews the JNOV using the manifest error standard of review. *Martin v. Heritage Manor South Nursing Home*, 00-1023 (La.4/3/01), 784 So.2d 627.

Accordingly, our first inquiry is whether the trial court erred in granting the JNOV.

For the following reasons, our review of the record convinces us that the trial court correctly granted the plaintiffs' motion for JNOV. In apportioning fault, the jury regarded the employer as primarily at fault. The employer's fault was not based on vicarious liability for the actions of its employee, since the employee was listed separately on the verdict form. Rather, the employer's fault as found by the jury was independent of the fault of Judice. The employer's fault, if it is to be construed as knowledge of the ADT's hazards, existed in isolation, without regard for the conduct of the ADT manufacturer or the mine site operator. The trial court could not reconcile these findings, and in granting the motion for JNOV, the court determined, as was stated in *Gibson v. Bossier City General Hospital,* 594 So.2d 1332, 1336

4

(La.App. 2 Cir. 1991), that "there was no valid line of reasoning and permissible inferences which could possibly lead rational men and women to the conclusion reached by the jury."

As did the trial court, we have reviewed the evidence to determine if the record supports a finding of 60% fault on the part of the employer. Because of the workers' compensation scheme, the employer cannot be found liable in tort to the plaintiffs and was not a party to this litigation or represented at trial. Consequently, evidence of MMD's actions was minimal. There was no evidence that MMD, a contractor at the mine site, was primarily responsible for safety at the site. There was insufficient evidence that additional employees at the site or further training of employees would have prevented this accident. Suggestions that MMD had knowledge of the ADT's significant blind spot, as well as other alleged design defects, necessarily implicates the manufacturer of the ADT, not its lessee. Finally, the proposition that MMD or Barras & Durand may have made modifications to the ADT, or may not have properly maintained it, were not causally linked to the accident which caused Mr. Domingue's death. Accordingly, in considering the plaintiffs' motion for JNOV, the trial court properly determined the evidence did not support a finding of the employer's 60% fault. Our review of the record convinces us that the trial court correctly granted the plaintiffs' motion for JNOV.

We turn now to the trial court's reapportionment of fault. Both the plaintiffs and Cameco presented a wealth of expert testimony regarding the issue of Cameco's alleged fault. The history and design of the 405-B ADT, including its advantages and shortcomings, were discussed at length. Essentially, the testimony and evidence presented by the plaintiffs' witnesses, O. Peter Smith, H. John Head, and Michael

5

Sutton, support the conclusion that Cameco shared the fault for Mr. Domingue's death. Conversely, while the testimony and evidence presented by Cameco's expert witnesses implicated both the decedent and his co-worker in causing the accident, their testimony did not exonerate Cameco.

Evidence of Cameco's liability, as found by the trial judge in granting the JNOV, is so strong and overwhelming that reasonable persons could not have found otherwise. The trial court found "the expert testimony presented by Mike Sutton and Peter Smith demonstrated that the blind spot on the 405B truck was caused by a [design defect] and was a proximate cause of Domingue's death." The trial court found the blind spot was exceptionally large, causing a driver to be unable to see, *at all*, a person of Domingue's height in the location of the accident. The court also found the design defect which causes the blind spot was not necessary to the functioning of the truck and could have been easily modified at minimal cost. Finally, the trial court explained that the driver's ability to articulate the truck in such a way so as to alleviate the blind spot is irrelevant in a situation such as this where the driver was already in the process of turning when the danger arose.

These factual conclusions are not manifestly erroneous and are supported by the evidence before us. Cameco acknowledged an "area of restricted visibility" for the driver of its ADT, an area much greater than that calculated for the truck used as a model for the design of the 405-B. Evidence of the blind spot was clear and showed that a person of the decedent's height could not be seen by the driver until he was more than sixteen feet in front of the truck. He could not be seen from head to toe until he was standing over fifty-two feet in front of the truck. The configuration of the truck which created the blind spot was not necessary for the proper functioning

of the truck, and, in fact, design modifications costing about $5,000.00 could have eliminated or greatly reduced the blind spot. Finally, the unrefuted testimony of the plaintiffs' accident reconstruction expert showed that the design defect of a significant forward blind spot was a direct cause of the accident at issue. The trial court considered this evidence and determined Cameco was 30% at fault in causing the accident which resulted in Mr. Domingue's death. We find no manifest error in this conclusion.

In two additional assignments of error, Cameco questions the trial court's exclusion of certain expert testimony of which the plaintiffs had no knowledge until after they had rested their case, and Cameco complains of improper communication between the trial judge and the jury following the verdict. We have reviewed the record and find no manifest error in the actions of the trial court.

We now address the plaintiffs' answer to appeal wherein they seek to have the percentage of fault attributed to Mr. Domingue reduced or eliminated. The record establishes that Mr. Domingue was an experienced heavy machinery operator. He had extensive experience in the operation of the 405-B ADT and, in fact, had operated one the week before this tragic accident. As the bulldozer operator at the Excalibar site, Mr. Domingue was responsible for building up the stockpile of barite ore and, thus, to a large extent determined the pathway used by the ADTs between the barge and the stockpile. He was also responsible for the placement of the bulldozer at the time of the accident. His placement of the bulldozer, in close proximity to the stockpile, necessitated that the operators of the ADTs make sharp right hand turns after dropping their loads in order to return to the barge for more barite ore. When Mr. Domingue left his bulldozer to assist Gonsoulin, he knew he was placing himself

in an area of danger. As an experienced ADT operator, he was well acquainted with the characteristics of the 405-B, including the areas of restricted visibility.

In reviewing the fact finder's allocation of fault, we are guided by the following standard of review:

> The applicable standard of review regarding the factual consideration of respective degrees of fault is the manifest error or clearly wrong standard. *Clement v. Frey,* 95-1119, 95-1163 (La. 1/16/96), 666 So.2d 607. This well-known standard prohibits an appellate court from altering a fact finder's determinations, unless those determinations and findings have been found to be clearly wrong upon review of the trial court record. While applying this standard, great deference must be given to the fact finder's results; however, the appellate court is required to simultaneously remain mindful of its constitutional duty to review the facts. La.Const. art. 5, §§ 5(C), 10(B); *Clement,* 666 So.2d 607; *Ambrose v. New Orleans Police Dept. Ambulance Serv.,* 93-3099, 93-3110, 93-3112 (La. 7/5/94), 639 So.2d 216. In doing so, should it be determined that the record supports a finding that the fact finder was clearly wrong or that it abused its wide discretion, this court is empowered to reallocate fault. *Clement,* 666 So.2d 607. The deference we continue to owe to the fact finder, however, restrains us in any such reallocation, in that we are allowed to adjust fault only to the extent of lowering or raising it to the highest or lowest point, respectively, which would have been reasonably within the jury's discretion. *Id.*

*Yellott v. Underwriters Ins. Co.,* 04-1342, p. 12 (La.App. 3 Cir. 8/31/05), 915 So.2d 917, 926, *writ denied*, 05-2439 (La. 4/24/06), 926 So.2d 540. Considering all the facts—Mr. Domingue's experience, his familiarity with the 405-B ADT, that he determined the path of the ADTs by his manipulation of the ore pile and his placement of the bulldozer, and that he placed himself in a location of known danger—we cannot say that the jury's allocation of 35% comparative fault is manifestly erroneous. Accordingly, the plaintiffs' answer to the appeal is denied.

We also deny the answer to appeal filed by Valley Forge, the workers' compensation intervenor. As an appellate court, we cannot take new evidence but may properly consider only evidence and testimony which is part of the record

submitted from the trial court. We find insufficient evidence in the record to allow us to render a money judgment in favor of Valley Forge reflecting the amount of benefits paid prior and subsequent to the judgment rendered herein. A final determination of what credit is due Valley Forge can be made only by the trial court.

For the above and foregoing reasons, the judgment notwithstanding the verdict issued by the trial court is affirmed. Costs of this appeal are assessed to Cameco Industries, Inc.

**AFFIRMED.**

PATSY ANN COLLINS DOMINGUE, ET AL.

VERSUS

EXCALIBAR MINERALS OF LOUISIANA, LLC, ET AL.

**PICKETT, J., dissenting.**

I respectfully dissent. A thorough review of the record leads to the conclusion that the trial court erred in granting the Motion for JNOV.

The majority correctly cites jurisprudence which sets forth the standard to be applied when determining whether a JNOV is appropriate. In the matter before us, however, the evidence does not point so strongly in favor of the moving party that reasonable men could not reach different conclusions. In fact, there was ample evidence before the jury to support its verdict.

The jury in this case attributed 60% of the fault in causing Mr. Domingue's death to his employer, MMD, 5% to Charles Judice, the driver of the ADT which ran over Mr. Domingue, and 35% to Mr. Domingue. The jury found Cameco to be free from fault, finding no design defect in the ADT involved in the accident. Since the trial judge's JNOV reversed the jury's finding on the issue of Cameco's fault, and Cameco is the lone appellant, our sole inquiry should be whether the evidence points so strongly in favor of finding Cameco at fault that reasonable men could not reach a different conclusion. Our jurisprudence tells us that a mere preponderance of evidence in favor of the mover is insufficient. In order for the JNOV to be properly

granted, the facts and inferences must be so strongly and overwhelmingly in favor of finding Cameco at fault that reasonable men could not have found otherwise. If, however, reasonable persons, in the exercise of impartial judgment, could have found Cameco free from fault, then it was error for the trial court to grant the motion and this court further errs by affirming the trial court's judgment.

My review of the record convinces me that the trial judge erred in granting the plaintiffs' motion for JNOV. While the testimony and evidence presented by plaintiffs' witnesses O. Peter Smith, H. John Head and Michael Sutton do in fact support a finding that Cameco shared the fault for Mr. Domingue's death, unlike the majority, I find the testimony and evidence presented by Cameco's witnesses, Ronald Adams, Ken Rodrigue, and Ronald Brass, exonerated Cameco. The fact that the jury obviously chose to accept the testimony of the Cameco witnesses does not, as the majority seems to believe, make them unreasonable.

Mr. Ronald Adams, who owned his own contracting business, testified that in the mid-1980s he was using DJB articulated dump trucks, touted by the plaintiffs' O. Peter Smith for their superior visibility. Mr. Adams stated that he was dissatisfied with the DJBs because of their short, narrow wheel base which caused oscillation, road rutting and instability. He testified that, when attempting to turn corners with a fully loaded DJB, the vehicle had a tendency to turn over. He further explained that the short wheel base would cause the rear tires to fall into the same ruts the front tires had just vacated, thus tearing up the roadway and causing the vehicle to oscillate. Because of his dissatisfaction with the DJB and his positive experience with Cameco 405-B tractors, he approached Cameco and asked if they could modify their 405-B tractor to accept a dump truck bed. He explained that he was interested in a stable

2

vehicle with a large "foot print" and a longer wheel base than the DJB. Cameco agreed to take on the project and converted three 405-B tractors to 405-B articulated dump trucks (hereafter ADTs or 405-Bs). The Cameco ADTs had dual tires on each side of its axles, both front and rear, giving it a large foot print. This large foot print increased its stability and decreased the amount of load placed on each tire. This not only allowed the vehicle to carry heavy loads but also increased the life of the tires. Mr. Adams was so impressed with the performance of the 405-Bs that the next year he ordered three more of the vehicles. He testified that he used those six machines from the mid-80s until he went out of business and auctioned them off in 1999. He stated that during that time none of the vehicles turned over or became involved in any accident because of poor operator visibility. When the ADTs were auctioned in 1999, they were equipped with large rear-view mirrors mounted on the roof on each side of the cab where the operator sat.

Ken Rodrigue, who started at Cameco, retired from John Deere (who acquired Cameco) as President of Cameco Industries. Mr. Rodrigue was one of the founders of Cameco and was serving as Executive Vice President of Production and Engineering at the time John Deere acquired the company. Mr. Rodrigue was Vice President of Production and Engineering at Cameco when the 405-B ADT was conceived and manufactured and was responsible for modification of the 405-B tractor into the 405-B ADT. He stated that Mr. Adams had purchased some 405-B tractors to use with some Cameco 12-C scrapers, was impressed with the tractors and inquired about the possibility of Cameco producing a 405-B ADT. Mr. Adams took Mr. Rodrigue to a building site, showed him the DJBs they were using and explained the problems he was having with the DJBs—tearing up the haul roads, getting stuck,

3

and the biggest problem, turning over. Cameco then designed and built the 405-B ADT to overcome the problems Mr. Adams was having with the DJBs. Hence, the longer and wider wheel base and the dual tires front and rear. Mr Rodrigue testified that Cameco equipped the ADTs with dual outside mirrors to permit the operator to see as much as possible and used hydrostatic power steering to make the ADT as easy to handle as possible.

The plaintiffs' experts were of the opinion that the dual front tires were unnecessary and were a design defect and a safety hazard as they decreased visibility and increased the turning radius of the 405-B. When queried about the necessity of dual front tires, Mr. Rodrigue explained that the ADT had to be designed to operate over different types of terrain. He stated that on soft ground, the dual front tires were necessary to provide sufficient "flotation" or ground pressure which he defined as "the force imposed . . . by the weight of the vehicle through the tire to the ground . . . usually measured in pounds per square inch." Insufficient flotation would cause the ADT to sink into soft ground, increasing rolling resistance thus making the machine inefficient. He also testified that on hilly terrain, the combined weight of the vehicle and its load would be principally on the rear axle and tires while going uphill, but would then shift to the front axle and tires when going downhill, i.e., weight distribution was not static, but a function of the grade which the ADT was traversing. Finally, he stated that, the dual tires front and rear, increased the ADTs footprint, greatly adding to its stability, thereby making it almost impossible to turn over.

The plaintiffs' claim that the vehicle was defective in design because of poor visibility due to the dual tires and a long hood. Mr. Rodrigue testified that the vehicle came equipped with large rear view mirrors mounted on the outside-top of the cab.

4

He explained that Cameco was aware of some limited visibility to the direct front of the ADT and included a warning in the manual which came with the vehicle that before proceeding, "make sure you have sufficient room to maneuver and the area is clear of personnel." "[A] product is not unreasonably dangerous or defectively designed where the evidence shows that the product can be safely used if the instructions in the operations manual are followed." *Delphen v. Dep't of Transp. and Dev.*, 94-1261, p. 8 (La.App. 4 Cir. 5/24/95), 657 So.2d 328, 334, *writs denied*, 95-2116, 95-2124 (La. 11/17/95), 663 So.2d 716, 717. He went on to say that, to increase visibility, a driver could stand up and/or look around the side or simply articulate the ADT to either side to see any area in which his visibility was restricted.

The defense's final witness was Mr. Ronald Brass, a retired John Deere engineering specialist who now owns his own consulting firm. He also addressed the plaintiffs' allegations of design defects. As to the dual tires, he explained that not only do they greatly increase stability, but they provide the vehicle with superior flotation characteristics. Mr. Brass stated that on a hard surface it takes approximately forty pounds of force per ton of a vehicle to over-come rolling resistance. Accordingly, if you wanted to push an automobile which weighed 4,000 pounds or two tons, you would have to apply eighty pounds of effort to move the car across a hard surface. He explained that on a soft surface, like mud or sand, the force required increases quickly and may reach 400-500 pounds per ton. He testified another advantage of dual tires is the increased useful life of the tires. He noted that industrial tires are quite expensive and that most tire failure is due to sidewall failure cause by flexing of the sidewall. Dual tires decrease sidewall flexing, thereby increasing tire life. He went on to say that dual tires also provide greater traction by

5

placing more tire surface in contact with the ground. As an example, he noted that in some parts of the country one finds some farm tractors with four-wheel-drive and triple tires.

In addressing the question of restricted visibility, Mr. Brass agreed "that when the machine is pointed in a particular direction and you look only across the very top of the hood that there is an area of restricted visibility ahead of the machine." Mr. Brass went on to say that he agreed with Mr. Rodrigue "that all you need to do is, is turn the steering wheel a bit and then you can see the area that would formerly have been hidden and you can turn the wheel the other way and you can see that area without difficulty." In addition, Mr. Brass explained, the seat on the ADT is fully adjustable, up and down, fore and aft, and even has "a weight adjustment which allows you to basically crank up the spring force to increase the height of the operator as he sits in the cab."

One of the plaintiffs' experts had opined that visibility was restricted because of inferior material in the windshield which permitted scratching and pitting. when questioned about this allegation, Mr. Brass replied:

> [T]he windows that were provided by Cameco, the windshield and the two quarter windows were made of a material identified as lexan. Lexan is one of the acrylic families. That's the clear kind of plastic that you see and it's very break resistance [sic]. That's the reason it was used here. It was not only lexan, but it was a special version of lexan called marguard, which has a scratch resistance [sic] surface, so it, it is the kind of material that you might use in the dirty, dusty kind of environment which this machine would be found in [sic].

In sum, Mr. Rodrigue stated, "I do not believe that the [design of the] 405B dump truck was a cause of the accident that involved Russell Domingue."

These witnesses' testimony as to the visibility is bolstered by a review of the video tape presented to the jury that clearly shows, when sitting in the driver's seat,

6

an unimpeded view of the area in front of the tires that ultimately ran over Mr. Domingue.

The majority relies, in affirming the JNOV, on the trial court's finding that "the expert testimony presented by Mike Sutton and Peter Smith demonstrated that the blind spot on the 405B truck was caused by a [design defect] and was a proximate cause of Domingue's death." The majority, however, ignores the evidence presented to the jury to the contrary.

The majority further notes that "[t]he trial court found the blind spot was exceptionally large, causing a driver to be unable to see, *at all*, a person of Domingue's height in the location of the accident. The court also found the design defect which causes the blind spot was not necessary to the functioning of the truck and could have been easily modified at minimal cost." A review of the record shows that these conclusions by the trial court are reached not by relying on uncontroverted evidence but on evidence that was highly controverted. For example, Mike Sutton, upon who's testimony the trial court relied in reaching its conclusion, testified on direct that Mr. Domingue was entirely in a blind spot from the time the ADT operator began moving the machine forward until Mr. Domingue was struck and killed. On cross-examination, however, it was established that Sutton did not necessarily have the correct information as to Mr. Domingue's location before the ADT pulled forward, and Sutton admitted that when Mr. Domingue was struck and killed by the left, outside tire he was not in a blind spot.

It is the jury's function to determine what testimony to accept and what to reject. Its is error on the part of the trial court to substitute its judgment for that of the jury when the jury verdict is clearly supported by the evidence. It is clear that

7

reasonable persons, in the exercise of impartial judgment, could have found Cameco free from fault and it was error for the trial court to grant the plaintiffs' motion for JNOV.

Accordingly, I would reverse the trial court's JNOV and reinstate the jury verdict.