885 So.2d 1211 (2004)
Virginia COOPER
v.
LOUISIANA STATE DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, Parish of Ascension, and ABC Insurance Company.
No. 2003 CA 1847.
Court of Appeal of Louisiana, First Circuit.
June 25, 2004.
Writ Denied November 8, 2004.
*1213 David L. Bateman, Baton Rouge, Counsel for Plaintiff/Appellant Virginia Cooper.
Charles C. Foti, Jr., Attorney General, John H. Ayres, III, Assistant Attorney General, Baton Rouge, Counsel for Defendant/Appellant State of Louisiana, through the Department of Transportation and Development.
Before: FOIL, FITZSIMMONS, and GAIDRY, JJ.
FITZSIMMONS, J.
Virginia L. Cooper (Jenny), plaintiff/appellant, appeals portions of a jury verdict against defendant, State of Louisiana, through the Department of Transportation and Development (DOTD). DOTD responsively contests the allocation of fault. Following our review of the facts and applicable law, we affirm, in part, and amend, in part.

FACTS
On July 6, 1997, Jenny was traveling in a southerly direction along Louisiana Highway 431 (Hwy. 431). She was involved in a single-vehicle accident as she rounded a curve, colloquially known as "Gator Glass curve," where Hwy. 431 intersected with Louisiana Highway 931 (Hwy. 931). The experts for both parties agreed that Jenny's vehicle took the following path: the right passenger side tires of Jenny's vehicle exited the travel lane as she proceeded through the curve; Jenny overcorrected to the left; Jenny then corrected to the right; the vehicle proceeded into the passenger-side ditch, whereupon it turned over. Jenny sustained a closed head injury, a facial laceration with an open left radius fracture, a broken radial bone on her left arm, and a crushed ulnar bone. She required multiple surgeries.
Following trial, the jury found Jenny to be 75% at fault; it attributed 25% fault to DOTD. Jenny was awarded $87,500.00 in damages as a result of the accident, in the following distribution: $40,000.00 in past medical expenses, $20,000.00 for future medical expenses, $5,000.00 in lost wages, $5,000.00 for loss of earning capacity, $7,500.00 for physical pain and suffering, $5,000.00 for mental pain, and $5,000.00 for disability and disfigurement. Applying the comparative fault allocation, Jenny was awarded a total sum of $21,875.00.
On appeal, Jenny contests the jury's allocation of 75% fault to her, the legal propriety of opinion testimony given by the investigating police officer, and the failure of the jury to award additional damages for physical and mental pain and suffering, wage loss, and disability and disfigurement. DOTD appeals the attribution of 25% fault to DOTD by the jury.

TESTIMONY BY POLICE OFFICER
It is submitted by Jenny that the court committed prejudicial error in allowing Police Officer Larry Perdue to give his *1214 opinion as to the cause of the accident. Trooper Perdue was one of the primary investigating officers of the subject accident. He was not qualified as an expert in accident reconstruction. In an oral pre-trial motion, counsel for Jenny sought to exclude from evidence any opinion by Trooper Perdue as to the causation of the accident in question. The court determined that it would "allow each state trooper to testify as to his observation at the scene of the accident and his opinion as to what was the cause of the accident based on his experience in accident investigation as a state trooper, not as a reconstruction expert."
In direct examination, Jenny's counsel asked Trooper Perdue to indicate what he was able to determine insofar as the path of the vehicle "based on the path or the tracks that [he] saw[.]" Trooper Perdue's description of the course charted by Jenny's vehicle parallels the conclusions reached by the experts for the opposing parties.
In response to questioning on cross-examination by counsel for DOTD, Trooper Perdue indicated that he had been a state trooper for six or seven months. He had received two weeks of training on the method to conduct an accident investigation subsequent to graduating from the police academy. He also stated that he had received prior accident investigation experience during an eight-year period as a deputy in Georgia. In Louisiana, he had investigated between twenty and forty accidents prior to handling Jenny's accident.
When asked to address the contributing factors indicated on the investigative report, Trooper Perdue stated that the primary causative factor for the collision was the vehicle's departure from the road after negotiating the curve. This fact was not disputed by the parties. Trooper Perdue also indicated that he had looked for potholes in the roadway that night and noted no defects on the roadway. Finally, Officer Perdue testified that the secondary factor listed on the accident report was "careless operation of the vehicle." This court interprets this testimony by Trooper Perdue to have traversed an evidentiary line into the arena of a conclusion, which is generally reserved for the province of a jury or expert.
Louisiana Code of Evidence article 701 permits non-expert testimony in the form of opinions or inferences that are rationally based on the perception of the witness and helpful to a clear understanding of his testimony or the determination of a fact in issue. Moreover, opinion testimony has been permitted by police officers who are not experts based on training, investigation, perception of the scene, and observation of physical evidence. Wingfield v. State, Department of Transportation and Development, 2001-2668, p. 19 (La.App. 1 Cir. 11/8/02), 835 So.2d 785, 801, writs denied, XXXX-XXXX (La.5/30/03), 845 So.2d 1059, XXXX-XXXX and XXXX-XXXX (La.5/30/03), 845 So.2d 1060, certiorari denied, 540 U.S. 950, 124 S.Ct. 419, 157 L.Ed.2d 282 (citing Whetstone v. Dixon, 616 So.2d 764, 768 (La.App. 1 Cir.1993), writ denied, 623 So.2d 1333). A violation of La. C.E. 701 or a finding of undue prejudice on the part of the witness, vel non, constitutes a determination within the discretion of the trial court. Wingfield, 2001-2668, p. 19, 835 So.2d at 802. As in Wingfield, this court concludes that wherever Trooper Perdue's testimony might have strayed into opinion beyond the parameters of article 701, such testimony was redundant to the testimony of DOTD's qualified expert. For these reasons, we do not perceive the testimony by Officer Perdue to be an abuse of the court's discretion, such that it would form a basis for reversible error or a de novo review. Nevertheless, in some instances, incorrect evidentiary rulings may form the basis for legal errors.

*1215 ALLOCATION OF FAULT

The collision occurred at approximately 1:30 a.m. There was no evidence of alcoholic consumption. It was the first time Jenny, a recent high school graduate, had attempted to negotiate the subject curve at night.
James R. Clary, Sr., an expert in highway design, safety, signing and maintenance, testified on behalf of Jenny. Mr. Clary portrayed the creation of an unreasonably dangerous condition due to the confluence of a 9 to 10 degree angle of the curve, as opposed to the acceptable 6 degrees; the loss of super elevation in curve; unevenness in pavement; lack of proper maintenance of potholes; nearly invisible markings of the pavement; fog lines; center lines; the absence of a no-passing line at the time of the accident; and an unguarded culvert. He concluded that Jenny drifted off the main travel portion of the road just north of the gore area. A "gore" area was defined as the section where Hwy. 431 and Hwy. 931 "[came] together and ... the area between the two." Mr. Clary further noted that the gore areas of roadways typically collect gravel, debris, and sand. He noted that the super elevation of the highway curve was not consistent, the shoulders were more narrow than the "as built" plans indicated, and the ditch for the slope was much sharper than the "as built" plans stated. Additionally, on the south end where the collision occurred, he stated that a ridge had formed that forced the highway to be elevated on the side.
An expert in accident reconstruction, John Rigol, Jr., testified that a reasonably prudent person could not have successfully recovered from the departure of Hwy. 431's main roadway once in the gore area at its intersection with Hwy. 931. Mr. Rigol similarly attributed this condition to the gore area's lack of super elevation, the gravel, and a "ball bearing" effect caused by the potholes. Referring to the yaw marks in photographs, Mr. Rigol stated that they proved Jenny did not simply drive straight off the highway. He explained that the potholes were critical because the prevalence of their undulations caused a constant compression of the suspension and a loss of friction. Mr. Rigol opined that the contact of Jenny's right tires with the severely deteriorated gore section of the highway produced a loss of friction, which contributed to Jenny's overcorrection to the left. Her next attempt to redirect the vehicle to the right resulted in her vehicle striking the open culvert on the right side of the road and flipping over.
Mr. Clary's and Mr. Rigol's testimony was contradicted by Joseph Blaschke, Ph.D. Dr. Blaschke was accepted as an expert in highway design and accident reconstruction. He conceded that it did not appear that Jenny drove faster than 45 miles per hour in the curve. His analysis differed, however, on the issue of the cause of Jenny's departure from the main portion of the highway. Dr. Blaschke opined that no evidence demonstrated that Jenny's vehicle began to slide at the beginning of the curve. In Dr. Blaschke's evaluation, the shoulder was reasonably safe. Dr. Clary believed that Jenny's inattentiveness caused her to drift off the road. Due to improper steering, she then overcorrected. He also questioned whether Jenny actually entered the gore area.
Jenny's accident took place in 1997; therefore, the provisions of La. R.S. 9:2800 are controlling vis a vis a claim against DOTD.[1] Although DOTD did not address *1216 the application of La. R.S. 9:2800 in its argument denying the existence of liability, a 1995 amendment of the statute requires a plaintiff to demonstrate that a public body had actual or constructive notice of the defective condition, in addition to proof of custody, a defective condition, and the creation of an unreasonable risk or a claim based on negligence. See Irion v. State, Department of Transportation and Development, 1998-2616, p. 8 (La.App. 1 Cir. 5/12/00), 760 So.2d 1220, 1227-1228, writ denied, 2000-2365 (La.11/13/00), 773 So.2d 727, and Rogers v. State, Department of Transportation and Development, XXXX-XXXX, p. 6 (La.App. 4 Cir. 3/7/02), 813 So.2d 495, 501-502, writ denied, XXXX-XXXX (La.6/14/02), 817 So.2d 1157.
Albert Shields, the highway maintenance superintendent for DOTD, agreed that Gator Glass curve required a significant amount of patching and that the shoulder repairs had been chronically problematic. He testified that he rode along Hwy. 931 and Hwy. 431 each week to check on roadway maintenance needs. Additionally, a DOTD "Complaint Record" was introduced into evidence on behalf of Jenny. The complaint record revealed the following relevant complaints to DOTD: notice of a large hole and several small holes at the intersection of Hwy. 431 and Hwy. 931 on September 23, 1996 (resulting in work by DOTD being "completed" by October 11, 1996); on February 13, 1997, a complaint about two potholes in both the north and southbound lanes (work was completed on February 14, 1997); on April 1, 1997 a report of a "bad pothole" on Hwy. 931 located one-fourth mile south of Hwy. 431; on June 20, 1997, notice that a driver hit a bad pothole and damaged two rims of his car in the southbound lane of the area where Hwy. 431 joins Hwy. 931 (work was completed by June 25, 1997); and on July 3, 1997, two complaints consisting of notice of the existence of bad potholes from "Gator Glass" to Port Vincent and another notice about potholes on Hwy. 431 at the "Gator Glass" area (the work assignments were completed on that same day). Three days following the completion of work at the Gator Glass area, the instant accident involving Jenny occurred. The department records additionally indicated that all work orders for that area had been completed as of July 12, 1997, six days after the accident made the subject of this appeal. Mr. Shields further testified that his staff returned to repair potholes two weeks later. Given Mr. Shields' stated routine review of the intersection of Hwy. 931 and Hwy. 431, the recurring complaints about roadway defects in the subject area, and particularly those at the "gore" area, as well as the occurrence of one of the complaints only three days prior to the accident, we find that DOTD had both actual and constructive notice of an unreasonably dangerous condition.
It is a well-established jurisprudential rule that a court of appeal may not set aside a trial court or a jury's findings of fact in the absence of manifest error or unless it is clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). In situations involving a conflict in the testimony, reasonable determinations of credibility and reasonable inferences of fact should not be disturbed, even if the appellate court might consider its own evaluations and inferences to be as reasonable. Id. In the case under review, this court does not find that the jury's conclusion was unreasonable. Faced with opposing theories, the jury apparently embraced the viewpoint that Jenny was primarily responsible for the accident when she left the main roadway and was unable to redirect her vehicle *1217 back to the proper lane; however, it also attributed a portion of the cause of the accident to an unreasonably dangerous condition in the gore area. We cannot construe the jury's allocation of fault between the parties to be an unreasonable one. The evidence supports the allocation of 75% fault to Jenny and 25% fault to DOTD.

PAIN AND SUFFERING; DISABILITY AND DISFIGUREMENT
The jury initially awarded no damages for past, present, and future physical and mental pain and suffering, past wage loss, and disability and disfigurement. After the trial court judge returned the verdict sheet to the jury to establish general damages to correlate with the awards of special damages, the jury responded with an award of $7,500.00 for physical pain and suffering, $5,000.00 for mental pain and suffering, $5,000.00 for past wage loss, $5,000.00 for loss of earning capacity, and $5,000.00 for disability and disfigurement. Thus, the jury awarded a total general damages award of $17,500.00 to Jenny.[2] With the exception of loss of earning capacity, Jenny has appealed the awards of general damages as inadequate.
Our review of the extent of injuries, treatment, and permanent disability and disfigurement to Jenny leads to the conclusion that the award given by the jury was so low that it fell beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular person under the particular circumstances, given the extensive injury, surgeries, pain and suffering, and impairment incurred. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993), certiorari denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Thus, we find that the jury award represents a clear abuse of its discretion. Id.
Dr. Charles S. Walker, an orthopedic surgeon, first treated Jenny in the emergency room. She presented with a closed head injury, facial laceration, crushed left ulnar bone, open left radius fracture, and significant abrasion or burn of the distal third of her forearm. Additionally, there was swelling of the forearm that required splitting of the facia. During the process of taking a CT scan, Jenny had a seizure and heart arrhythmia.
Six screws were placed in Jenny's hand to reassemble the damaged bones. Following surgery, the ulnar fracture failed to heal as well as expected; therefore, a second operation was performed on July 9, 1997 to close the volar (underside) portion of the arm. Unfortunately, Dr. Walker was unable to fully close the back side of her forearm. On July 11, 1997, a third surgery was performed by a plastic surgeon to close the back side. This surgery required skin debridement and a split-thickness skin graft. Jenny's hand continued to exhibit significant swelling as of July 17, 1997. Although the fracture had healed three months after the accident, x-rays performed in January 1998 showed increased bone formation detrimental to the flexibility of the ulnar. Another surgery was recommended to excise the extra bone; however, the instability of the grafted skin over the wrist complicated the procedure. The surgical procedure had not been performed by the time of the trial.
*1218 Jenny complained of pain when she lifted trays and carried food at her job at the Sonic Restaurant. She stated that she ultimately quit working at Sonic for that reason. Dr. Walker opined that Jenny would continue to have pain whenever she held objects for a long period of time or lifted anything heavy. Dr. Walker also stated that she would have significant long-term impairment of motion. Jenny would also suffer from arthritis in the hand area, which he commented she should already be experiencing. He opined that she would have permanent scarring on her arm from the surgeries and grafts. Dr. Walker stated that Jenny would not be able to perform jobs involving any substantial hand mobility or strength.
Jenny testified at trial that her current vocational goals were a career in the field of computer office work, for which she had been trained in school. Dr. Walker stated that long term use of the computer might present problems for Jenny. The recommended future surgery would probably improve the limited rotation of the arm or increase the motion; however, he did not expect her flexion or rotation of the forearm to improve. Additionally, he noted that a worsening of her condition might require a fusion of the wrist. Finally, Dr. Walker noted that in addition to the job limitations, Jenny's injuries would forever make it difficult for her to perform everyday rotational tasks, such as opening doors, turning keys to start engines, or opening jars.
Jenny's mother, Karen J. Cooper, testified that following her return from the hospital, her daughter was afraid. She had to be bathed and have her wound dressings performed by another person. Jenny also stated that her mother assisted her with her personal needs, such as driving, washing her hair, and changing her bandages. As of the trial date, Jenny indicated that she continued to have trouble with activities, such as lifting heavy objects, holding babies, cleaning heavy dishes. She remained unable to open a car door with her left hand.
A review of comparable cases involving injuries to the arm and wrist presents the following general damage awards: $300,000.00 in Riser v. Acadiana Limousine Service, 96-1687 (La.App. 3 Cir. 4/30/97), 693 So.2d 330, writ denied, 97-1420 (La.9/19/97), 701 So.2d 173, which involved a comparable medical diagnosis, treatment, and disabilities[3]; $400,000.00 in Rivere v. Union Pacific Railroad Company, 93-1132 (La.App. 1 Cir. 10/7/94), 647 So.2d 1140, writ denied, 95-0292 (La.3/24/95), 651 So.2d 295, to an adult who had to undergo seven operations on his arm and a permanent partial disability; and $160,000.00 in Hammock v. Louisiana State University Medical Center in Shreveport, 34,086 (La.App. 2 Cir. 11/1/00), 772 So.2d 306, to a young girl who underwent multiple surgeries involving the radial head of her arm and who had lost 50% supination and 70% pronation of her wrist. Considering the foregoing, this court finds that the lowest general damages award that the jury could have reasonably awarded would have been $155,000.00 to be divided into the classifications of pain and suffering and disability and disfigurement.

Pain and Suffering
Factors to be reviewed in the assessment of the quantum awarded for pain and suffering are the severity and duration thereof. Fleniken v. Entergy Corporation, XXXX-XXXX, p. 29 (La.App. 1 Cir. 2/16/01), 780 So.2d 1175, 1194. The undisputed evidence demonstrates that Jenny continued to experience physical pain and suffering from the time of her injury until the time of trial. Moreover,
*1219 Dr. Walker's prognosis indicated that the pain would be long-term and probably worsen in the future as a result of arthritis. He recommended another surgery for partial improvement, and he opined that there was also a possibility of the need for a fusion of the wrist in the future. Notwithstanding consideration of the evidence in a light most favorable to DOTD, we deem the lowest sum for past, present and future physical and mental pain and suffering to be $70,000.00. See Youn, 623 So.2d at 1260.

Disability and Disfigurement
Dr. Walker declined a request to assign a specific percentage of disability. However, he pronounced that Jenny's supination of her wrist was 18 degrees, as compared with a normal supination of 80-90 degrees. Jenny's pronation was 36 degrees, as opposed to the normal range of 85-90 degrees. Finally, she was capable of 16 degrees of flexion when she bent her palm down, compared to the normal 40 to approximately 80 degrees. Dr. Walker stated that she had "significant limitation of ability to bend her hand down." Thus, Jenny had approximately 20% of normal supination of the wrist, approximately 40% of normal wrist pronation capability, and her wrist was capable of only about 1/3 the normal flexion. Absent a future successful surgery, all of these limitations were considered permanent. Dr. Walker also noted that the substantial scar on Jenny's arm would be permanent.
Although no expert testimony was elicited to give a particular sum for the percentage of disability or disfigurement, the jury apparently considered Dr. Walker's testimony in making its disability and disfigurement award of $5,000.00. Again the jury's award of $5,000.00 for an injury that caused significant impairment of motion in Jenny's forearm and wrist is so depressed that it constitutes an abuse of discretion. Jenny will have to live the rest of her life with an arm that is badly discolored, scarred, and incapable of performing myriad routine functions, such as the rudimentary task of opening a car door. We increase the sum for disability and disfigurement to $85,000.00, which is the lowest amount reasonable relative to comparable jurisprudential awards.

DECREE
In sum, the judgment of the trial court assigning 75% fault to Virginia Cooper and 25% fault to the State, Department of Transportation and Development, is affirmed. The general damages award is amended to $155,000.00. In all other respects the judgment of the trial court is affirmed. Costs associated with this appeal are assessed to the State, Department of Transportation and Development, in the sum of $3,250.00.
AFFIRMED, IN PART; AMENDED, IN PART.
NOTES
[1] The provisions contained in La. R.S. 9:2800, as revised pursuant to 1995 La. Acts Nos. 1328 and 828, have been jurisprudentially deemed substantive in nature. Irion v. State, Department of Transportation and Development, 1998-2616, p. 8 (La.App. 1 Cir. 5/12/00), 760 So.2d 1220, 1227. The amendment is not applicable to incidents occurring prior to November 23, 1995, the effective date of the amendment.
[2] Past lost wages do not constitute general damages. Although Jenny argues that the failure of the jury to initially award any sum for past lost wages constituted legal error, she does not appeal the jury's ultimate reformed award of $5,000.00 in past lost wages. Accordingly, the award of $5,000.00 for past lost wages remains unchanged. It is also noted that loss of earning capacity, which constitutes another special damage, is not raised as an assignment of error on appeal.
[3] This sum excludes the additional $100,000.00 awarded in punitive damages.