# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 19-625

JOSHUA SIMPSON

VERSUS

U V INSURANCE RISK RETENTION

GROUP, INC., ET AL.

**********

APPEAL FROM THE
THIRTY-FIRST JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON DAVIS, NO. C-628-15
HONORABLE ELLIS J. DAIGLE, DISTRICT JUDGE

**********

## D. KENT SAVOIE
## JUDGE

**********

Court composed of John D. Saunders, Phyllis M. Keaty, and D. Kent Savoie, Judges.

**AFFIRMED.**

**Bryan David Scofield**
**James T. Rivera**
**Jessica W. Marchand**
**Scofield & Rivera, LLC**
**P. O. Box 4422**
**Lafayette, LA 70502**
**(337) 235-5353**
**COUNSEL FOR DEFENDANT/APPELLANT:**
 **Kenny Ray Young**
 **Specialty Transportation Group, LLC**
 **United Vision Logistics**
 **U V Insurance Risk Retention Group,Inc.**

**Jeremy N. Morrow**
**NeunerPate**
**1001 W. Pinhook Rd., Suite 200**
**Lafayette, LA 70503**
**(337) 237-7000**
**COUNSEL FOR INTERVENOR/APPELLEE:**
 **Steward Steel, Inc.**
 **LCTA Casualty Insurance Company**

**Blake R. David**
**Robert B. Brahan, Jr.**
**Broussard & David, LLC**
**P. O. Box 3524**
**Lafayette, LA 70502-3524**
**(337) 233-2323**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
 **Joshua Simpson**

**SAVOIE, Judge.**

Defendants Kenny Ray Young, Specialty Transportation Group, LLC, United Vision Logistics, and UV Insurance Risk Retention Group, Inc. appeal the trial court judgment in favor of Plaintiff Joshua Simpson. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

This matter arises out of an automobile accident which occurred on November 5, 2014, on Interstate 10 west of Jennings, Louisiana, between Joshua Simpson and Kenny Young. Joshua Simpson was employed by Steward Steel, Inc. and driving a Penske rental delivery truck with the purpose of delivering doors from Lafayette, Louisiana to Lake Charles, Louisiana. While driving, Mr. Simpson came upon a convoy of 18-wheelers transporting oversized tanks. Kenny Young was driving one of the 18-wheelers, which was owned by Specialty Transportation Group. Specialty Transportation Group leased the 18-wheeler to United Vision Logistics, LLC, a Lafayette commercial trucking company. As Mr. Simpson was attempting to pass Mr. Young in the left-hand lane, the accident occurred.

In his petition, Joshua Simpson alleged that Kenny Young failed to yield when changing lanes, causing an accident which resulted in injuries and damages to Mr. Simpson. Steward Steel and L.C.T.A. Casualty Insurance Company (L.C.T.A.), Steward Steel's insurance carrier, filed an intervention for the purpose of recouping workers' compensation benefits paid to Mr. Simpson. A jury trial was held from February 11-14, 2019, and the jury found Defendants negligent. The jury awarded Mr. Simpson $1,299,433.00. Defendants filed a Motion for Judgment Notwithstanding the Verdict and a Motion for New Trial and/or Remittitur. The trial court denied the motions, except that it reduced the amount of damages for past medical expenses from $117,174.00 to $61,154.19. The amount of the revised judgment is $1,243,413.19 plus legal interest and costs. Defendants now appeal.

## ASSIGNMENTS OF ERROR

1. The District Court erred in allowing Trooper Babineaux to give opinion testimony. Thus, a *de novo* review or new trial is warranted.

2. The District Court erred in excluding the surveillance video. Thus, a *de novo* review or new trial is warranted.

3. The District Court erred in excluding the expert testimony of Paul Fontana. Thus, a *de novo* review or new trial is warranted.

4. The District Court erred in failing to allow evidence of prior and subsequent claims. Thus, a *de novo* review or new trial is warranted.

5. Whether subject to *de novo* or the manifest error standard of review, the jury erred in its award of past lost wages.

6. Whether subject to *de novo* or the manifest error standard of review, the jury erred in its award of future lost wages/earning capacity.

7. Whether subject to *de novo* or the manifest error standard of review, the jury erred in its award of awarding future medical expenses.

8. Whether subject to *de novo* or the manifest error standard of review, the jury erred in its award of general damages.

## LAW AND DISCUSSION

### I. *Evidentiary Errors*

### A. Trooper Babineaux's Testimony

Trooper Camille Joseph "Joey" Babineaux, Jr., worked for the Louisiana State Police and responded to the subject accident. Defendants argue that Trooper Babineaux was improperly allowed to give opinion testimony. Specifically, they complain that he was able to give opinion testimony regarding Plaintiff's lack of fault, the position of Plaintiff's vehicle, and that the left lane was not clear when Mr. Young moved from the right lane. Trooper Babineaux was not tendered as an expert witness, and, therefore, Defendants argue, he could not give opinion testimony.

Defendants cite *Yellott v. Underwriters Ins. Co.*, 04-1342 (La.App. 3 Cir. 8/31/05), 915 So.2d 917, *writ denied*, 05-249 (La. 4/24/06), 926 So.2d 540, for the

proposition that a trooper cannot give opinion testimony if the trooper is not tendered as an accident reconstructionist. In *Yellott*, the trooper determined the location of the cars on the roadway at the time of the accident based on skid marks found at the scene. This court determined:

> We recognize that, in some instances, our appellate courts have affirmed the admission of opinion testimony by police officers who are not experts, based on their training, investigation, perception of the scene, and observation of physical evidence. *See Eldridge*[ *v. Carrier*, 04-203 (La.App. 3 Cir. 11/17/04),] 888 So.2d 365[, *writ denied*, 04-3174 (La. 3/1//05), 896 So.2d 66] (citing *Cooper v. State Dep't of Transp. & Dev.*, 03–1847 (La.App. 1 Cir. 6/25/04), 885 So.2d 1211, *writ denied*, 04–1913 (La.11/8/04), 885 So.2d 1142); *Bozeman v. State Dep't of Transp. & Dev.*, 34,430 (La.App. 2 Cir. 4/4/01), 787 So.2d 357, *writ denied*, 01–1341 (La.6/29/01), 794 So.2d 813. Trooper Mann was not tendered as an expert in accident reconstruction at trial. He possessed experience in accident investigation, as most troopers do. However, this experience did not talismanically allow Trooper Mann to determine the location of the parties['] vehicles and the resulting *cause* of the accident. The admission of this testimony was legal error.

*Yellott*, 915 So.2d at 926.

Mr. Simpson counters that Louisiana courts have consistently allowed opinion testimony of an investigating officer based on his or her rational perception of the scene, in accordance with La.Code Evid. art. 701. He further argues that Defendants failed to contemporaneously object to the line of questioning during the trial.

In *Haas v. Romero*, 07-974 (La.App. 3 Cir. 2/20/08), 977 So.2d 196, *writ denied*, 08-650 (La. 6/6/08), 983 So.2d 917, the plaintiff objected to the trooper's conclusion regarding the location of a passenger inside the vehicle. This court found:

> Louisiana Code of Evidence Article 701 permits lay witnesses to offer testimony in the form of opinions or inferences if such testimony is 1) rationally based on the perception of the witness and is 2) helpful to a clear understanding of his or her testimony or the determination of a fact in issue. A trial court is afforded broad discretion in permitting testimony of a lay witness in accordance with Article 701. *Eldridge*[, 888 So.2d 365]; La.Code Evid. art. 701, comment b. In ruling on this issue, the trial court remarked that, although Trooper Overfelt was not tendered as an expert, the jury would be able to assess the weight of his investigative conclusions given his field experience. We find no abuse of discretion in this determination.

3

Trooper Overfelt explained that, although not a certified accident reconstructionist, he had investigated thousands of vehicle accidents during his twenty-five years of experience as a State Trooper. He testified as to his arrival at the scene, reviewed the details of his crash report, and explained that he identified the point at which the Romero truck impacted a parked vehicle before coming to rest. When asked why he had identified Mr. Leleux as the right front passenger in the report, he denied that it was based on Mr. Leleux's statement alone, stating that he believed it was based on evidence at the scene, including "[w]here the impact occurred, the way it occurred, when it struck the Vehicle Number 2." He admitted that he did not "recall exactly what it was." He further explained that he never determined which of the three men was the driver of the vehicle.

The record supports the conclusion that Trooper Overfelt's conclusions were based on his rational perception of the scene as is required by Article 701. Any weight afforded to the statement was within the province of the jury.

*Haas*, 977 So.2d at 200.

After a review of the record, we find no error in the admission of Trooper Babineaux's testimony. When Plaintiff's counsel asked Trooper Babineaux to explain what his investigation revealed, Defense counsel lodged an objection. After a back and forth, Defense counsel stated that it would be "fine" if Trooper Babineaux read from his report. Trooper Babineaux then read his report on the record. Later in Trooper Babineaux's testimony, Defense counsel did object based on Trooper Babineaux's lack of personal knowledge, however, the trial court allowed Trooper Babineaux to answer because his testimony was based upon his investigation.

Trooper Babineaux stated that he reviews the entirety of the evidence before him to determine whether a person is in violation of a traffic law. A review of Trooper Babineaux's report shows that he made his determinations based on his perceptions at the scene, the statements of both drivers, and the witness statement of Chad Frederick. Mr. Frederick was behind the accident when it occurred and witnessed it. Trooper Babineaux concluded that Mr. Simpson had established himself in the left-hand lane at the time of the accident.

4

Regarding the fault of the parties, Trooper Babineaux testified:

A. All right. During the course of the investigation, everybody thinks that we do the at fault thing. To me, that's a bad word. That's insurance companies that do the at fault. We determine, if - - if we can, who committed any type of traffic violations that may have contributed to the crash. We're not putting blame or fault on anyone. That's not what we do 'cause insurance can 50/50 fault and all that mess. We don't get into that.

What the evidence had showed me that day was Mr. Simpson had no violations. He was in the left-hand lane.

The jury also heard that Trooper Babineaux had twenty-three years in the field investigating automobile accidents. He spent his first eight years with the Cameron Parish Sheriff's Office before beginning his employment with the Louisiana State Police, where he has worked for the past fifteen years.

"The district court is awarded vast discretion in its decisions on evidentiary rulings, and its decision to admit or exclude evidence will not be reversed on appeal absent a clear showing of abuse of that discretion." *Young v. Joy*, 09-756, p. 2 (La.App. 3 Cir. 2/3/10), 30 So.3d 1116, 1119. We find *Haas* instructive in the present case. The trooper in *Haas* had nearly the same years of experience as Trooper Babineaux. The testimonies were similar in that both testified as to what they saw on the scene and as to what the witnesses told them to form their conclusions. This is not a case where Trooper Babineaux measured skid marks to determine where and how fast the 18-wheelers were moving at the time of the accident, which was the case in *Yellott*.

An investigating officer is allowed to give testimony based on their rational perception of the accident scene. The record in this case supports the determination that Trooper Babineaux's conclusions were based on his rational perception of the accident scene. As stated in *Haas*, "[a]ny weight afforded to the statement was within the province of the jury." *Haas*, 977 So.2d at 200. Trooper Babineaux's testimony was proper. This assignment of error has no merit.

5

**B. Exclusion of the Surveillance Video**

Next, Defendants complain that the trial court erred in excluding surveillance video. On January 2, 2019, Defendants supplemented their discovery responses to inform Plaintiff that they had a surveillance video in their possession. Defendants explained that they had "no obligation to produce or describe the requested information until another supplemental deposition of Plaintiff has been taken." Defendants had previously deposed Joshua Simpson on September 28, 2016, and September 18, 2018. The second time, he was deposed less than five months prior to the trial date and less than four months before the close of discovery. Mr. Simpson argues that there was no substantial change in his condition during the intervening four months since his last deposition, therefore a third deposition was unwarranted. He further argues that Defendants never formally noticed or moved to compel Plaintiff's testimony after supplementing their discovery responses.

The trial court's scheduling order states:

4) Discovery shall be completed no later than <u>twenty (20) days</u> prior to the trial date. Ultimately discovery requests are subject to objection on that basis. The Court will neither compel discovery sought nor consider motions to compel filed later than <u>twenty (20) days</u> prior to the trial date.

In addition, Mr. Simpson formally requested all surveillance in discovery served with the initial petition on October 8, 2015.

Defendants cite the Louisiana Supreme Court decision of *Wolford v. Joellen Smith Psychiatric Hospital*, 96-2460 (La. 5/20/97), 693 So.2d 1164, to support their argument that the trial court should have allowed the surveillance video into evidence. In *Wolford*, the court explained:

During the course of pre-trial discovery, plaintiffs requested that defendant produce any surveillance videotapes in its possession. Defendant admitted that it had two such tapes in its possession, one made in 1993 and one made in 1995. However, defendant refused to produce the tapes arguing that it was entitled to take a supplemental deposition of Mrs. Wolford to question

6

her about her physical injuries and activities during the time pictured in the surveillance videotapes before producing them. Plaintiffs filed a motion to compel production of the videotapes. Defendant in turn filed a motion to compel Mrs. Wolford to submit to a supplemental deposition. The trial judge ordered defendant to immediately disclose the surveillance videotapes and denied defendant's request to take a supplemental deposition prior to the disclosure of the tapes. The court of appeal denied defendant's writ application. Upon defendant's application to this court, we granted certiorari to review the correctness of the trial judge's order.

*Id.* at 1165-66.

The *Wolford* court discussed "the narrow issue before [it] involving the timing of the discovery of surveillance videotape in relation to the deposition of the plaintiff." *Id.* at 1166-67. In modifying a previous holding, the court ruled "in favor of a general rule giving preference to post-deposition disclosure of surveillance materials." *Id.* at 1167. Therefore, the case turns on a different issue than the present case, wherein the issue before us is whether Defendants produced the video in a reasonable time prior to trial. Despite this, *Wolford* is instructive. The court stated:

The general rule is that the plaintiff's deposition precede the production of the surveillance videotape, absent a showing by the plaintiff of special circumstances. This rule best serves the overarching purpose of our system of justice—to search for the truth. Ours is an adversarial system of justice that relies on the ability and resources of adversaries to uncover the truth by testing each other's evidence through a variety of methods, the most important of which is cross-examination. Moreover, in an adversarial system, the defendant has a right to a defense and to cross-examination. In a personal injury case, surveillance videotape can be critical to the defendant's defense and ability to effectively cross-examine the plaintiff. Surveillance materials may thus serve an important function in the search for truth and, absent special circumstances, their value should be preserved by delaying their disclosure until after the deposition of the plaintiff.

However, we recognize that surveillance videotape may not be totally reliable, that it may be taken out of context, and that it is vulnerable to manipulation through various editing techniques. **For these reasons, we emphasize that although the production of surveillance videotape is to be delayed until after the plaintiff's deposition, the plaintiff is entitled to the videotape a reasonable time before trial, so as to give the plaintiff ample time to determine any weaknesses in the videotape. Our rule thus balances the defendant's need to preserve valuable potential impeachment evidence for use during cross-examination and the plaintiff's need to determine whether the videotape is authentic or misleading.**

7

*Id.* at 1167-68 (emphasis added).

In its oral ruling on the issue, the trial court ruled:

Okay. I read the Wolford case, gentlemen, and I am able to determine in that case, of course, that it's important that this surveillance is - - that the deposition's taken before the surveillance according to the Supreme Court unless there's, so to speak, exigent circumstances. I also realize that the plaintiff - - or the plaintiff's argument is when he comes in and says, you know, I have no time to depose anyone or prior to see if the surveillance as that case indicated that it's totally reliable, not out of context, et cetera, and the time period involved. In Wolford, of course, there was a deposition - - a second deposition being requested some four years after the first one, also that the - - the plaintiff in that case had not requested the production of the surveillance videotapes until 1996. That's quite some time after the case was - - began. Here, the surveillances were requested at the time of filing of the petition, and I realize that both of you have good legitimate arguments in connection with the surveillance tape. But we're at trial time and we're taking to trial and I don't know when you're going to be able to take these depositions or - - or, first of all, take the deposition, second of all, on the plaintiff's side, verify the context, et cetera or do the ex- - - the exploration to, in fact, respond to the deposition or to the contents of the deposition. In connection with that, I'm going to deny your - - your motion or uphold the motion - - grant the motion to exclude                                        the                                        surveillance.

Joshua Simpson requested production of surveillance videos with his original petition in October 2015, Mr. Simpson had previously been deposed twice, the last time less than five months prior to trial, and Defendants informed counsel for Mr. Simpson on January 2, 2019, of the existence of the surveillance video with trial set on February 11, 2019. Defendants did not disclose the surveillance video to Plaintiff within a reasonable time prior to trial. For these reasons, we find no abuse of the trial court's discretion in excluding the surveillance video.

**C. Exclusion of Paul Fontana's Expert Testimony**

Defendants complain that the trial court improperly excluded the testimony of Paul Fontana, a physical therapist with The Fontana Center in Lafayette, Louisiana. Mr. Fontana was retained by Defendants to critique the Functional Capacity Examination (FCE) of Joshua Simpson performed by Christopher Hoffpauir, Mr.

Simpson's physical therapist at Rosewood Rehabilitation. Mr. Hoffpauir concluded that Joshua Simpson was only capable of performing light duty. Defendants argue that Mr. Fontana's qualifications and methodology were never challenged by anything but argument. Defendants contend that it was prejudicial, legal error to exclude Mr. Fontana's testimony, and, therefore, Defendants are entitled to a new trial.

Plaintiff argues that Paul Fontana was properly excluded from testifying at trial. Defendants produced Mr. Fontana's report, dated January 4, 2019, on January 10, 2019. Trial was set for February 11, 2019. Mr. Simpson contends that Mr. Fontana's report offered no new evaluation of Joshua Simpson's functional work capacity. Rather, it critiqued Mr. Hoffpauir's report. In fact, Mr. Fontana's report could not have been an evaluation of Mr. Simpson's functional work capacity because Mr. Fontana never actually evaluated Joshua Simpson, never spoke to Mr. Simpson's treating physicians, and he never reviewed Mr. Simpson's medical records. Plaintiff asserts that Mr. Fontana's report did not identify any criteria, published literature or other evidence to support his critique of Mr. Hoffpauir's report. For these reasons, Plaintiff contends that Mr. Fontana's testimony was properly excluded.

Louisiana Code of Evidence Article 702(A) provides the standard for admissibility of expert testimony. The article states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (2) The testimony is based on sufficient facts or data;
>
> (3) The testimony is the product of reliable principles and methods; and
>
> (4) The expert has reliably applied the principles and methods to the facts of the case.

In *Blair v. Coney*, 19-795, pp. 8-9 (La. 4/3/20), ___So.3d___, ___, the Louisiana Supreme Court explained the law pertaining to the exclusion of expert witnesses thus:

> The district court performs the important gatekeeping role of ensuring "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Cheairs*[ *v. State ex rel. Dep't of Transp. and Dev.*, 03-680, p. 7 (La. 12/3/03)], 861 So. 2d [536,] 541 (citing *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.*], 509 U.S. [579,] 589, 113 S.Ct. 2786). Accordingly, a district court is afforded broad discretion in determining whether expert testimony is admissible, and its decision with respect thereto shall not be overturned absent an abuse of that discretion. *Cheairs*, 861 So. 2d at 541 (citing *State v. Castleberry*, 98-1388 (La. 4/13/99), 758 So. 2d 749, 776); *see also* C.E. art. 702, cmt (d) ("[b]road discretion should be accorded the trial judge in his determination as to whether expert testimony should be held admissible and who should or should not be permitted to testify as an expert."); *State v. Foret*, 628 So. 2d 1116, 1123 (La. 1993) ("The admission of the evidence [is] subject to the discretion of the trial judge.") (internal quotations omitted); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142, 119 S. Ct. 1167, 1171, 143 L. Ed. 2d 238 (1999) (finding the gatekeeping role of the district court recognized in *Daubert* applies to all forms of expert testimony).
>
> In exercising its gatekeeping duty, the district court must be mindful of the balancing of interests set forth in C.E. art. 403 – *i.e.*, whether the probative value of the expert testimony outweighs its prejudicial effect – as an expert's testimony can be misleading and prejudicial if this role is not properly satisfied. C.E. art. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time."); *see State v. Foret*, 628 So. 2d at 1122 (finding the use of Child Sexual Abuse Accommodation Syndrome-based testimony for the purpose of bolstering a witness's credibility creates a risk of prejudice that outweighs its questionable probative value).

In discussing the applicability of La.Code Evid. Art. 702(A), the *Blair* court stated, "Failure of the witness to qualify as an expert pursuant to the introductory paragraph of C.E. art. 702(A) *or* failure of the testimony to meet any of the indicia of reliability or relevancy set forth in C.E. art. 702(A)(1) through (A)(4) will render the testimony inadmissible." *Blair*, ____ So.3d at ___ (emphasis in original).

The *Blair* court discussed *Godchaux v. Peerless Ins. Co.*, 13-1083 (La.App. 3 Cir. 6/4/14), 140 So.3d 817, *writ denied*, 14-1411 (La. 10/3/14), 149 So.3d 801, a case out of our circuit. The supreme court explained:

10

The Third Circuit Court of Appeal addressed the admissibility of Dr. Bain's testimony in *Godchaux v. Peerless Ins. Co.*, 2013-1083 (La. App. 3 Cir. 6/4/14), 140 So. 3d 817, a case wherein plaintiffs argued that the jury failed to provide sufficient damage awards and that such failure was related to the district court's error in admitting Dr. Bain's testimony. *Id.* at 1. In *Godchaux*, Dr. Bain was introduced as an expert in biomechanics and injury causation analysis. *Id.* at 3. The court noted that Dr. Bain never spoke to plaintiff, never contacted plaintiff's physicians, never visited the accident scene, never inspected plaintiff's vehicle, never spoke with a damage appraiser, did not know the body position of the plaintiff at the time of the accident, did not consider the angle of impact or the dimensions of the vehicular head rack that struck plaintiff's vehicle, and failed to conduct an analysis of force using the same type of vehicle involved in the collision. *Id.* at 8.

The court of appeal in *Godchaux* reversed the district court's ruling admitting Dr. Bain's testimony, finding that although Dr. Bain likely *qualified* as an expert in biomechanics and injury causation analysis, his opinions and methods were nonetheless *unreliable*. *Id.* at 4. Considering that Dr. Bain did not recreate the actual accident and only relied on a crash analysis of a different make and model to assess the force asserted on the plaintiff's vehicle, the *Godchaux* court concluded Dr. Bain's findings were "inherently suspect" without evidence of support from the scientific community. *Id.* at 8. Since Dr. Bain did not testify as to the reliability or potential errors in the crash analysis, the court found the comparative data on which he relied was also "inherently suspect." *Id.* Moreover, the court held that Dr. Bain's testimony did not assist the jury in determining a fact in issue, reasoning that force-of-impact testimony cannot be used to disprove causation. *See id.* at 9.10 Accordingly, the court of appeal in *Godchaux* found that the trial court abused its discretion in permitting Dr. Bain to testify. *Id.* at 10. A writ application was filed with this Court, which we denied. *Godchaux v. Peerless Ins. Co.*, 2014-1411 (La. 10/3/14), 149 So. 3d 801.

It is clear from the record that the trial court struggled with finding a basis for Mr. Fontana's methodology. Defense counsel was questioned multiple times about Mr. Fontana's principles and methods. It is not clear from Mr. Fontana's report what methodology he used, therefore, it cannot be determined if the methodology is reliable. Furthermore, Mr. Fontana never evaluated Joshua Simpson, never spoke to Mr. Simpson's treating physicians, and he never reviewed Mr. Simpson's medical records. In light of *Blair* and *Godchaux*, we find that the trial court did not abuse its discretion in excluding Mr. Fontana from testifying as an expert witness in this matter.

**D. Failure to Allow Evidence of Prior or Subsequent Claims**

11

Defendants next complain that they should have been allowed to introduce evidence of Joshua Simpson's prior claims. Mr. Simpson was previously involved in an automobile accident in 2012, which required treatment for injuries to his neck. He was also involved in minor accidents in 2005 and 2007.

A review of the record shows that the trial court granted the motion in limine as it pertained to evidence of prior claims and settlements, but allowed Defendants to introduce evidence of Mr. Simpson's prior injuries and treatment. Defense counsel questioned Mr. Simpson extensively regarding his prior collisions, and his injuries and treatment as a result of those collisions. Dr. David Muldowny, a physician with the Lafayette Bone & Joint Clinic and Joshua Simpson's treating physician, was also questioned about Mr. Simpson's previous accidents and injuries.

This court in *Edmond v. Guillory*, 18-437, p. 1 (La.App. 3 Cir. 2/6/19) (unpublished opinion), explained:

> The trial court has great discretion in its consideration of evidentiary matters such as motions in limine. *Heller v. Nobel Ins. Group*, 2000-261 (La. 2/2/00), 753 So.2d 841; *Furlough v. Union Pacific RR Co.*, 33,658 (La.App. 2 Cir. 8/31/00), 766 So.2d 751, *writ denied*, 2000-2929 (La. 1/12/01), 781 So.2d 556. On review, the appellate court must determine whether the trial court abused its great discretion in ruling on a motion in limine.

In *Ewell v. Schwegmann Giant Super Markets*, 499 So.2d 1192 (La.App. 3 Cir. 1986), the plaintiff denied a previous back injury and the treatment he received for it. Along with the trial court, this court found that the plaintiff lacked credibility and found the plaintiff's testimony to be questionable. In allowing evidence of prior injury and claims, the court determined:

> [E]vidence of prior injury and claims is admissible insofar as they bear upon any issue before the court, including credibility, and to establish whether the disability is causally related to the particular accident. *Meyers v. Employers Liability Assurance Corp.,* 176 So.2d 658 (La.App.1965). Thus, plaintiff's objection on grounds of irrelevancy to the trial judge's admitting into evidence testimony of his past injuries is also without merit.

*Id.* at 1195.

Defendants cite *Brown v. Diamond Shamrock, Inc.*, 95-1172 (La.App. 3 Cir. 3/20/96), 671 So.2d 1049, for the proposition that evidence of prior claims are admissible. In that workers' compensation case, the claimant denied ever having filed a claim for disabling injuries. This court determined that, "[w]hile the prejudicial effect of this evidence of a prior claim admittedly makes this issue close," evidence of prior claims could be used for impeachment purposes. The court in *Ronquillo v. Belle Chase Marine Transp., Inc.*, 629 So.2d 1359 (La.App. 4 Cir. 1993), also allowed evidence of prior claims for impeachment purposes.

In the present case, there is no indication by Defendants that evidence of prior claims was necessary to impeach the testimony of Joshua Simpson. There is no evidence that he ever denied the prior accidents or the injuries that he sustained as a result of the accidents. His credibility has not been called into question. Furthermore, Mr. Simpson was questioned at length about these prior accidents and injuries as was his treating physician, Dr. Muldowny. We do not see how Defendants were prejudiced by the exclusion of this evidence. Therefore, we find the trial court did not abuse its discretion in excluding evidence of Mr. Simpson's prior claims and settlements.

## II. Damages

### A. Past Lost Wages

The jury awarded Joshua Simpson $148,720.00 in "Past Loss of Income & Income Capacity" damages. Defendants argue that this amount is not supported by the evidence.

> This court set forth the standard in determining past lost wages and stated that: "Lost wages 'need not be precisely proven, they must be shown with reasonable certainty.' " *Taylor v. Premier Ins. Co.,* 98-1935, p. 7 (La.App. 3 Cir. 6/30/99); 742 So.2d 35, 40 (citations omitted). "An award for lost past wages can be 'computed on the amount the plaintiff would have in all probability' earned had he been able to work." *Id.* at pp. 7–8; 40. (Citations omitted). This court has consistently held that a plaintiff's

uncorroborated testimony is sufficient to prove lost wages as long as such proof is uncontradicted and reasonably establishes his claim. *Green v. Superior Oil Co.,* 441 So.2d 54 (La.App. 3 Cir.1983); *Richard v. Teague,* 92–17(La.App. 3 Cir. 5/4/94); 636 So.2d 1160, *writ denied,* 94–1934 (La.11/11/94); 644 So.2d 388. "It is well settled that factual conclusions of the trial judge particularly where the credibility of a witness is involved, are entitled to great weight and will not be disturbed upon appeal." *Charles v. Arceneaux Ford, Inc.,* 542 So.2d 846, 850 (La.App. 3 Cir.1989) (citations omitted).

*Skipper v. Berry*, 99-1433, p. 8 (La.App. 3 Cir. 3/15/00), 762 So.2d 56, 61-62.

Defendants argue that the calculations of Plaintiff's expert witness in this area, John Theriot, was less than the amount awarded by the jury. Mr. John Theriot, the Plaintiff's expert witness in economics, testified that his calculations for Mr. Simpson's lost earning capacity totaled $115,494.00, plus $16,897.00 in fringe benefits. Adding these together equates to $132,391.00. Therefore, Defendants argue that the jury award for these damages is not supported by the evidence. The difference between the jury award and Mr. Theriot's calculation is $16,329.00. Defendants also argue that Mr. Simpson did not receive fringe benefits with his job at Steward Steel, and, therefore, the award should be reduced by this amount as well.

Plaintiff points to testimony by Jeff Peterson, his vocational rehabilitation expert, that Joshua Simpson worked fifty hours the week before the accident, earning ten hours of overtime. He further testified that Joshua Simpson's actual annual earnings at Steward Steel ranged between $27,040.00, which included no overtime, to $40,045.00, which did include overtime. Joshua Simpson testified that in his position at Steward Steel he was able to work as much overtime as he liked. He was paid $13.00 per hour, plus overtime of $19.50 per hour. Regarding Mr. Theriot's testimony, his expert report explained that his calculations used the most conservative amount earned by Mr. Simpson, which was his income that did not include overtime or $27,040.00.

Plaintiff argues that the jury was not limited to Mr. Theriot's conservative calculations where no overtime was utilized, but rather the jury was able to rely on the

14

totality of the evidence. Plaintiff further contends that the jury's actual award was fully supported by the evidence. For example, had the jury used $40,045.00, which was Jeff Peterson's calculation of Mr. Simpson's annual earnings with overtime, Joshua Simpson's past lost earning would have totaled $170,992.15. This calculation does not include any amount for fringe benefits. Plaintiff points out that this amount is higher than the jury's actual award for lost wages.

Based on the evidence before us, we find that the jury did not abuse its discretion in the amount awarded to Joshua Simpson for his past lost wages claim.

### B. Future Lost Wages/Earning Capacity

The jury awarded Joshua Simpson $371,800.00 for "Future Loss of Income & Earning Capacity." Mr. Theriot testified that Mr. Simpson's future lost wages would fall within a range of $152,673.00 to $441,058.00, depending on how many hours per week he worked. Defendants argue that the amount awarded is too high and should be reduced.

In *Myers v. Broussard*, 96-1634, pp. 18-19 (La.App. 3 Cir. 5/21/97), 696 So.2d 88, 98, this court explained:

> Before [the plaintiff] can recover for her loss of future earning capacity, she must prove the loss, not with mathematical certainty, but with reasonable certainty. *Gauthier v. Kansas City S. R. Co.,* 96–529 (La.App. 3 Cir. 11/6/96); 682 So.2d 993, *writ denied,* 96–2918 (La.1/24/97); 686 So.2d 867. Future loss of earnings is inherently speculative and must be proven with a reasonable degree of certainty; purely conjectural or uncertain future lost earnings will not be allowed. *Perritt v. Commercial Union Ins. Co.,* 95–1274 (La.App. 3 Cir. 3/13/96); 673 So.2d 215, *writ denied,* 96–1751 (La.10/11/96); 680 So.2d 644. An award for loss of future earning capacity is not based merely upon the difference between the injured person's pre-accident wages and post-accident wages but rather it should be based on the difference between the injured person's earning capacity before and after the accident. *Hollie v. Beauregard Parish Police Jury,* 96–198 (La.App. 3 Cir. 8/28/96); 680 So.2d 1218.
>
> In determining the proper amount to be awarded, the trier of fact should consider the injured person's age, life expectancy, work life expectancy, investment income factor, productivity increase, prospects for rehabilitation, probable future earning capacity, loss of future earning

capacity, loss of earning ability, and inflation. *Gauthier,* 96–529; 682 So.2d 993. Our review of this award is governed by the manifest error standard. *Veazey v. State Farm Mut. Auto. Ins.,* 587 So.2d 5 (La.App. 3 Cir.1991). "The appellate question is not whether a different award may have been more appropriate, but whether the trial court's award can be reasonably supported by the record." *Id.* at 7.

Mr. Theriot testified that Mr. Simpson's future lost wages would fall within a range of $152,673.00 to $441,058.00, depending on how many hours per week he worked. Joshua Simpson's age at the time of trial was forty-three years, and he had a work life expectancy of 15.4 years. This means that the jury awarded Mr. Simpson $24,142.86 per year for the duration of his expectant work life.

Defendants further argue that Joshua Simpson did not sustain a loss of earning capacity. They contend that Mr. Simpson previously owned and operated his own lumber service, earning a substantial income of over $133,000.00 per year. Plaintiff counters that vocational rehabilitation expert Jeff Peterson explained that "the chances of [Joshua] getting back into something like that, it's one of those things where it's nip to nil."

Considering the foregoing, we find the jury's award in the amount of $371,800.00 for future lost pages and loss of earning capacity is reasonably supported by the record. The jury did not abuse its discretion in the amount of the award. This assignment is without merit.

### C. Future Medical Expenses

Joshua Simpson was awarded $171,739.00 in "Future medical expenses" by the jury. Defendants argue this award should be reduced because the life care plan is filled with mistakes.

"To recover future medical expenses, the plaintiff must present medical testimony to show that it is more probable than not that future medical treatment is indicated and the probable cost of the treatment." *Smith v. Municipality of Ferriday*,

05–755, pp. 11-12 (La.App 3 Cir. 2/1/06), 922 So.2d 1222, 1231, *writ denied*, 06–934 (La. 9/29/06), 937 So.2d 860.  Defendants do not dispute the need for future treatment, but rather disagree with the cost of said treatment.

Mr. Jeff Peterson drafted Joshua Simpson's life care plan at issue in this assignment of error.  On the witness stand, he admitted that he mistakenly overestimated the number of future annual visits to Dr. Muldowny and also mistakenly included prescriptions for the medications Remeron and Wellbutrin.  Mr. Theriot, Plaintiff's economist, testified after Mr. Peterson about Mr. Simpson's life care plan.  On re-direct examination, Mr. Theriot testified:

> Q. You - - you read some numbers on the life-care plan as well, didn't you?
>
> A. Yes, I did.
>
> Q. And - - and you - - you updated your life-care plan to - - to record that Wellbutrin and [Remeron] coming out as well as having the appropriate number of visits for Dr. Muldowny, correct?
>
> A. Yes, I did.
>
> Q. And that life - - that's the life-care plan that Dr. Berard, and Dr. Muldowny, and Dr. Hodges endorsed and Dr. - - and - - and Jeff Peterson put together who we just talked to?
>
> A. That's my understanding, yes.

Mr. Theriot was then asked about his calculation of Joshua Simpson's future medical expenses in the life care plan.  He stated:

> Q. And so what is that number?
>
> A. Yes, so the number - - the calculation I made after the adjustment that Mr. Peterson talked about that he said the - - the one mistake that I did - - that he did tell me about in the back so I - - I re - - - before he got on the witness stand.  So I made that calculation, and it was $171,739.00.
>
> Q. Okay.  And that's based on the testimony of Dr. Muldowny, and Dr. Hodges, and Dr. Berard, and their recommendations to Jeff Peterson having Muldowny just see Mr. Simpson one time for the next nine years and taking out those two medications that Dr. Berard now said are only possibilities not probabilities, correct?

17

A. That's correct.

Q. $171,739.00?

A. That's right.

Therefore, while Defendants complain about mistakes in the life care plan, those mistakes were corrected by the testimony of Plaintiff's economist, Mr. Theriot. It is no coincidence that the jury awarded Mr. Simpson future medical expenses in the exact amount calculated by Mr. Theriot after the mistakes were rectified. In *Menard v. Lafayette Ins. Co.*, 09-1869, p. 13 (La. 3/16/10), 31 So.3d 996, 1006, the Louisiana Supreme Court explained:

> [I]t is well acknowledged an award for future medical expenses is in great measure highly speculative and not susceptible to calculation with mathematical certainty. *Highlands* [*Ins. Co. v. Missouri Pacific R. Co.*], 532 So.2d [317,] 324 [(La.App. 3 Cir. 1988)]. It follows, therefore, such awards "generally do not involve determining the amounts, but turn on questions of credibility and inferences, i.e., whose experts and other witnesses does the jury believe?" Maraist & Galligan, *supra*, § 7.02, 7–4.

The jury clearly found Mr. Theriot to be credible on this issue as they used the amount he calculated, after revision, in its award of future medical expense to Mr. Simpson.

"An appellate court, in reviewing a jury's factual conclusions with regard to special damages, must satisfy a two-step process based on the record as a whole: *there must be no reasonable factual basis for the trial court's conclusion, and the finding must be clearly wrong.*" *Id.* at 1007. We find that there is a reasonable factual basis for the jury's decision to award future medical expenses to Joshua Simpson in the amount of $171,739.00, and we do not find that it is clearly wrong. This assignment has no merit.

**D. General Damages**

The jury awarded Joshua Simpson $80,000.00 in "Past Pain, Suffering & Mental Anguish," $200,000.00 in "Future Pain, Suffering, & Mental Anguish," $60,000.00 in

18

"Past Loss of Enjoyment of Life," and $150,000.00 in "Future Loss of Enjoyment of life" for a total of $490,000.00 awarded in general damages. Defendants contend that this amount is too high, arguing that Joshua Simpson's injuries pre-dated the accident.

The Louisiana Supreme Court in *Wainwright v. Fontenot*, 00-492, p.6 (La. 10/17/00), 774 So.2d 70, 74, set forth the standard to be used by an appellate court when reviewing a quantum award, stating:

> The assessment of "quantum," or the appropriate amount of damages, by a trial judge or jury is a determination of fact, one entitled to great deference on review. As such, "the role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact." *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1260 (La.1993). Moreover,
>
> > before a Court of Appeal can disturb an award made by a [factfinder,] the record must clearly reveal that the trier of fact abused its discretion in making its award. Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court.
>
> *Coco v. Winston Indus., Inc.*, 341 So.2d 332, 334 (La.1977) (internal citations omitted).

Dr. Muldowny treated Mr. Simpson for his previous injury, as well as his injuries as a result of this accident. Speaking of whether Joshua Simpson's injuries were new injuries caused by the accident at issue, Dr. Muldowny testified:

Q. And do you, in your expert opinion, think that Joshua Simpson had a new injury in this accident or was it an aggravation of an old injury? What's your opinion about that?

A. I think it was a new injury. Enough time had gone by when he was pain free to - - to suggest that it's a new injury.

Joshua Simpson testified:

Q. And in the - - in the, say, five or six months before this accident, five months before this accident, when you were working doing the brickwork and then working for Steward Steel doing this heavy work, were you taking any prescription medication:

A. No, sir.

Q. Any even over-the-counter medication:

A. No, sir.

Joshua Simpson further testified that, prior to the accident, he was performing heavy labor as a mortar mixer. Therefore, the jury heard testimony that, prior to the accident, Mr. Simpson was off of all of his pain medications and was working heavy labor. Dr. Muldowny further testified:

Q. And given - - and - - and we're going to fast forward now, but - - but - - but given your records and your - - your history of treatment with Joshua Simpson and your expertise, the condition you treated him for and that he eventually had surgery for, could he have done the heavy lifting he was doing before with those type of symptoms and that type of injury?

A. I don't believe so, no.

Dr. Berard is a medical psychologist who treated Joshua Simpson as a result of this accident. He testified regarding Mr. Simpson's psychological issues, depressive disorder, anxiety disorder, erectile dysfunction, and chronic pain syndrome. He testified:

Q. And so your diagnosis when you first saw [Joshua Simpson] was what?

A. My diagnosis was, number one, male erectile dysfunction based - -

Q. What caused that?

A. The cause is the combination, in my opinion, of the psychological overlay correlated with pain and the changes in the neurochemistry correlated with or based on the acute experience of pain during the act that releases a neurotransmitter hormone called norepinephrine which is the part of what cases the erectile dysfunction. So you have the physical, the neurochemistry, and the psychological overlay, and, of course, the effect of these medications will affect a person's ability to function in a normal way.

Q. And - - and so there was that, and then you have pain disorder, depression, and adjustment disorder?

20

A. The pain disorder, yes, is consistent with what we've already testified. It's based on the medical findings by Dr. Muldowny which involves imagining studies and validates there's a physical basis for his pain.

The other diagnostic entity is a depressive disorder. He presented to me with symptoms consistent with depression, but consistent with a major depression to include suicidal thoughts and death wishes. The other - -

Q. It wasn't - - it wasn't that far. I got you.
Go ahead.

A. And the other diagnostic entity is an anxiety disorder, and it's not to a perceived level of intensity as a generalized anxiety disorder, but it's more transient and part of the disability and the complications experienced in his life as a result of the chronic pain.

While Defendants argue that Mr. Simpson's injuries pre-dated this accident, we defer to the jury's evaluation of the witness's credibility and the firsthand evidence. *See Bouquet v. Wal-Mart Stores, Inc.*, 08-309 (La. 4/4/08), 979 So.2d 456. The jury clearly found Dr. Muldowny to be credible and believed his assessment that Joshua Simpson's injuries are a result of the subject accident. Further, based on the testimony and evidence in the record, we find that the jury was well within its discretion in the amount it awarded to Mr. Simpson for general damages. Accordingly, this assignment of error lacks merit.

## CONCLUSION

Based on the foregoing, the judgment of the trial court is affirmed. Costs of these proceedings are assessed to Defendants Kenny Ray Young, Specialty Transportation Group, LLC, United Vision Logistics, and UV Insurance Risk Retention Group, Inc.

**AFFIRMED.**

21